STATE OF NORTH CAROLINA v. LARRY WADE PRICE

NO. 44

(Filed 2 December 1980)

1. Constitutional Law § 61; Jury § 7.1— exclusion of group from jury — showing required

In order to establish a *prima facie* case that there has been a violation of the requirement that a jury be composed of persons who represent a fair cross-section of the community, defendant must document that the group alleged to have been excluded is a distinctive group, that the representation of the group in question within the venire is not fair and reasonable with respect to the number of such persons in the community, and that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

2. Constitutional Law § 61; Jury § 7.1— exclusion of group from jury — requirements of group

In determining whether a group is distinctive or cognizable for the purpose of a challenge to a jury selection plan, three factors which must be considered are whether there is some quality or attribute in existence which defines or limits the membership of the alleged group, whether there is a cohesiveness of attitudes, ideas, or experiences which serves to distinguish the purported group from the general social milieu, and whether a community of interest is present within the alleged group which may not be represented by other segments of the populace.

3. Constitutional Law § 61; Jury § 7.1— jury representing cross-section of community — young people not a distinct group

The N.C. Supreme Court does not recognize "young people" as a distinct group for the purpose of determining whether a jury panel represents a fair cross-section of the con.munity, since the parameters of such a group are difficult to ascertain, as evidenced by the widely varying ages which have been used to define it; defendant failed to demonstrate that the values and attitudes of this purported group are substantially different from those of other segments of the community or that the values and attitudes of the members of the purported

group are cohesive and consistent; and the membership of the purported group is constantly in flux with persons aging out of it as well as growing into it.

**4. Constitutional Law § 61; Jury §§ 7.1, 7.4— blacks and young people — representation in jury pool fair and reasonable**

Defendant failed to show that the representation of young people between the ages of 18 and 29 and blacks within the venire was not fair and reasonable with respect to the group's presence within the relevant community, and he failed to show that such misrepresentation was the result of a systematic exclusion of the group by the jury selection process, since during the time in question blacks made up 17.1% of the jury pool but 31.1% of the county's population; young people between the ages of 18 and 29 made up 22.5% of the jury pool but 33.3% of the county's population; such disparity did not establish that the components of the population of the county were not reflected fairly and reasonably in the jury pool; the jury pool was chosen through use of property tax listings and voter registration records; and such method created a broad and extensive data base which was appropriately employed to give the competing perspectives in the community a reasonable opportunity to participate in the judicial process through service on a jury.

**5. Criminal Law § 77.2— defendant's statement that shooting was self-defense — exclusion as hearsay**

Defendant's statement to officers at the time of his arrest that the shooting had been in self-defense was properly excluded from the jury's consideration because of the statement's hearsay character.

**6. Homicide § 19.1— shooting deaths — self-defense alleged — evidence of violent nature of victims**

There was no merit to defendant's contention in a homicide prosecution that the trial court erred in excluding evidence concerning the predisposition to violent behavior of the victims, since the court excluded testimony in two instances, but in neither case was the answer which the witness would have given placed in the record; on several occasions defendant offered evidence to which the State objected, and the objection was granted, but no motion to strike was made so that the evidence was before the jury notwithstanding the State's objection; and other evidence which defendant sought to place before the jury but which was excluded was merely repetitive.

**7. Homicide § 15— evidence of gun held by victims' son — attempt of investigator to test fire — evidence not prejudicial**

In a homicide prosecution where the evidence tended to show that defendant shot his victims, the trial court did not err in admitting testimony by an investigator from the sheriff's department that he had received a shotgun from an uncle of the victims' son three months after the shootings and that he had attempted to test-fire the weapon, since the investigator's testimony served to flesh out the account the victims' son offered concerning his conduct during the incident, and even if the evidence was too remote to have been properly placed before the jury, defendant failed to demonstrate how the evidence was prejudicial to his interests.

**8. Jury § 9— juror's calling of defense counsel — juror properly removed —alternate juror properly substituted**

The trial judge did not abuse his discretion in removing a juror and substituting the alternate juror where the original juror contacted defense counsel at his home during the week-end recess and persisted in discussing matters of a personal nature, including counsel's marital status, and though there was no evidence that any matter which related to the trial of defendant was discussed during the conversation, the exercise of discretion by the trial judge served to safeguard the trial of defendant from even the appearance of impropriety. G.S. 15A-1215 (a).

**9. Criminal Law § 114.3— jury instructions — no expression of opinion**

There was no merit to defendant's contention in a homicide prosecution that the trial judge impermissibly expressed an opinion (1) on the credibility of defendant and those of his relatives who testified on his behalf, since the court's instruction on interested witnesses was proper; (2) by failing to reinstruct the jury on the elements of self-defense when the jury on two occasions returned to the courtroom and requested additional instructions on the crimes charged, since a trial judge who has complied with a request by the jury for additional instructions is not required also to repeat his instructions as to other features of the case which have already been correctly given; and (3) in instructing the jury on the procedure which was to be followed upon their return of a verdict which found defendant guilty of first degree murder, since the judge's comments did not precipitate a rush to judgment by the jury.

Justice BROCK did not participate in the consideration or decision of this opinion.

APPEAL by defendant from judgments of *Rouse, J.*, entered at the 31 October 1979 Criminal Session of WAYNE Superior Court.

Defendant was tried upon bills of indictment proper in form which charged him with two counts of first-degree murder and one count of discharging a firearm into an occupied building.

The state introduced evidence which tended to show:

On the afternoon of 22 May 1979, defendant and his wife visited in the home of Glenn Cashwell and his wife on Highway 55 near Mt. Olive, North Carolina. Defendant and his wife lived approximately 1,000 feet from the Cashwell family on the opposite side of the highway. Both defendant and Mr. Cashwell were unemployed. The couples had gathered to discuss the possibility of the two men obtaining employment in Virginia.

Between 3:30 p.m. and 4:00 p.m., defendant and his wife left the Cashwell trailer and returned to their own home to pack their belongings for the impending trip to Virginia. At the time the couples parted company, their relationship was amicable.

At about 4:10 p.m., Mrs. Price returned to the Cashwell residence visibly upset. In the presence of her husband, Mrs. Cashwell tried to calm her neighbor. Some fifteen minutes later, Mr. Cashwell left his home in an automobile and drove to the Price trailer to make an inquiry as to what had happened. He was accompanied by his fifteen-year-old son, Billy, who was later to be the state's principal witness.

Upon their arrival at defendant's home, Mr. Cashwell went to the front door and Billy went to the back door. Responding to Billy's knocking, defendant went to the back door and let the teenager enter the dwelling. Defendant had appeared at the entrance in an unkempt manner. Billy and defendant walked through the trailer to the front door where Mr. Cashwell was standing. Defendant opened the door and invited his neighbor to enter the home. Mr. Cashwell talked with defendant for approximately ten minutes seeking to calm him. After a short while, defendant agreed to return to the Cashwell home.

Upon defendant's arrival at the Cashwell home, the couples resumed their discussion. After approximately a half hour, defendant took off his wedding ring and threw it on the kitchen table, whereupon Mr. Cashwell asked him to leave the trailer. Defendant complied with the request, leaving the residence immediately in an agitated state. Defendant's wife remained in the kitchen with the Cashwell couple.

Approximately forty-five minutes after he had left the Cashwell home, defendant returned, driving a gray Pontiac automobile. During the time of defendant's absence, the Cashwells sat at their kitchen table with Mrs. Price and talked with her. When defendant drove into the driveway, Billy Cashwell, who was standing at the front door, called out to his father, "Daddy, Larry Price is back." Defendant remained seated in his car until Mr. Cashwell went out the front door. At that time, defendant's automobile was approximately forty feet from the front door of the Cashwell trailer.

As Mr. Cashwell walked out the front door of his home, defendant got out of the car and produced a shotgun. Aiming his weapon at Mr. Cashwell, defendant demanded that his wife be sent out of the house to him. Mr. Cashwell indicated that he would not do as defendant had demanded. Defendant thereupon replied that if Mr. Cashwell did not send Mrs. Price out of the house he would "blow his (Cashwell's) brains out." Ten minutes passed as the two men confronted each other in silence across the yard.

Meanwhile, Mrs. Cashwell had called the Mt. Olive Police Department seeking assistance. Throughout the encounter, Mrs. Cashwell remained in the trailer. As his mother talked frantically on the telephone, Billy took down a shotgun from the gun rack and went to the front door with it. When Billy brought the gun to the front door, defendant saw the weapon and ordered the boy to put it down. The teenager complied with the demand, laying the shotgun down on the floor beside a front window.

The confrontation between the two men ended with Mr. Cashwell telling defendant, "Go ahead and shoot me in the back. I am going in the house." Mr. Cashwell turned away from defendant and raised his hands into the air as he walked toward the front door of his home. As he reached the entrance after having taken about three steps, Mr. Cashwell was shot in his back by a blast from defendant's weapon. Mrs. Cashwell was shot as she stood by the front door talking on the telephone. Both of the Cashwells were fatally wounded. At the time he fired, defendant was standing against an oak tree in the front yard of the Cashwell home.

Defendant fled the scene in his car. Around midnight, some six hours after the killings, defendant was arrested in Wilson County by police officers who had received information concerning the killings. Defendant told the officers that he had been charged with a double homicide in Wayne County.

Defendant introduced evidence, including his own testimony, which tended to show:

On Friday, 22 May 1979, he was unemployed and he, his wife and infant daughter were preparing to move to Virginia. Previously he was employed by Georgia-Pacific Corporation where Glenn Cashwell was a co-worker. While defendant had heard of Mr. Cashwell for much of his life, the two men did not actually meet one another until Mr. Cashwell went to work at Georgia-Pacific. They had been friends for approximately five to six weeks prior to 22 May 1979.

On the morning of 22 May 1979, defendant called Mr. Cashwell on the telephone and asked him to drive him to the plant to pick up his paychecks and his car. Mr. Cashwell was willing to meet the request but suggested that defendant call the factory to make sure that the paychecks would be ready. Upon calling the plant and learning that his paychecks would be ready, defendant again called

the Cashwell trailer and talked with Mrs. Cashwell who agreed to drive defendant to the factory. As defendant and Mrs. Cashwell were driving off, they saw Mr. Cashwell at a distance. They stopped and defendant went on to the plant with Mr. Cashwell.

After defendant picked up his paychecks and turned in his tools, defendant and Mr. Cashwell ran errands in the area. Around 11:00 a.m., they returned to the Cashwell residence where they began drinking liquor with their wives. After a short while, defendant and his wife left the Cashwells to attend to some personal matters, only to return in early afternoon. Not long after the Price couple returned to the Cashwell home, a dispute erupted when Mr. Cashwell apparently suggested that the wives remain together in North Carolina while he and defendant went to Virginia seeking work. Defendant insisted that Mr. Cashwell's plan was not what he had in mind. At around 3:00 p.m., defendant and his wife returned to their own trailer but only after Mrs. Price expressed an intention to remain with Mrs. Cashwell.

Upon returning to their own home, the Price couple continued arguing with one another over the arrangements for the trip to Virginia. After being pushed against the wall in their home by her husband, Mrs. Price fled to the Cashwell trailer. Between fifteen and twenty minutes later, Mr. Cashwell drove up to the Price residence and asked defendant what was wrong. Defendant told him that he did not approve of the Cashwells trying to influence Mrs. Price concerning the planned trip to Virginia. After Mr. Cashwell left, having been told that defendant no longer wished to be his friend, defendant packed a few clothes and drove back to the Cashwell trailer.

Upon his arrival, defendant insisted upon having his wife accompany him to Virginia, but she refused. At about the same time, defendant's sister, Deborah Williams, entered the trailer. As she walked in, Mr. Cashwell pushed her into a chair and ordered her not to move. The argument between the couples continued until defendant took off his wedding ring and threw it on the kitchen table after having been told by his wife that her parents were on their way to pick her up and take her back home. Thereupon, defendant returned to his trailer alone.

A few minutes later, Glenn Cashwell and his son, Billy, arrived at defendant's residence. Billy entered the trailer through the back door and talked briefly with defendant as they walked together

through the house to the front door where Mr. Cashwell was waiting. Upon entering the trailer, the elder Cashwell began slapping defendant and pushing him about the residence. Defendant retreated into the kitchen where he procured a butcher knife which he used to force Mr. Cashwell to leave the premises.

Five or six minutes later, defendant telephoned his wife, who was still at the Cashwell home, telling her that if she did not return home, he would go there and get her himself. Defendant then drove to the nearby trailer. As he drove up in the yard, defendant saw Mr. Cashwell coming out of the front door carrying a knife whose blade was approximately 2½ inches long. As Mr. Cashwell approached, defendant reached into the back seat of his car to retrieve a hard hat but before he could do so, Mr. Cashwell was upon him and pressed the knife to his side, telling defendant to leave the premises. Defendant immediately left and went to the home of his sister where he borrowed a shotgun, saying that he intended to go back to the Cashwell trailer and pick up his wife and child. Before returning to the home of the Cashwells, defendant went to the home of a neighbor and procured ammunition for the weapon.

As defendant drove into the driveway, he saw Mr. Cashwell coming out of the house. Mr. Cashwell walked across the yard and stopped at the rear of another automobile. As Mr. Cashwell came around the rear of the car, he reached into his pocket, and defendant pulled out his gun. After defendant demanded that his wife and child be sent out to him, Mr. Cashwell told him to put down his weapon. Mrs. Cashwell, meanwhile, had appeared at the front door. She withdrew momentarily into the house and reappeared at the door bearing a shotgun. When Mrs. Cashwell pointed the weapon at defendant, he fired his gun and fled the scene.

The jury returned verdicts finding defendant guilty of the second-degree murder of Mr. Cashwell, guilty of the second-degree murder of Mrs. Cashwell, and guilty of discharging a firearm into an occupied dwelling. The court entered judgments imposing life prison sentences in the murder cases and a prison sentence of 8-10 years in the other case, all sentences to run concurrently. We allowed defendant's motion to bypass the Court of Appeals in the discharging a firearm case.

*Attorney General Rufus L. Edmisten, by Assistant Attorney General Jane Rankin Thompson, for the state.*

*John W. Dees for defendant-appellant.*

BRITT, Justice.

By his first assignment of error, defendant contends that the trial court erred in denying his pretrial motion challenging the jury pool on the ground that blacks as well as young people between the ages of 18 and 29 were underrepresented in the pool. He argues that he was denied due process of law. There was no error in the denial of the motion.

At the hearing on the motion, defendant presented the testimony of Mr. James O'Reilly, a doctoral candidate in the field of sociology with an emphasis in demography at Duke University. Mr. O'Reilly conducted studies on the demographics of the Wayne County jury pool for the periods of 1976-1977 and 1978-1979. The purpose of these studies was to determine the correlation between the racial makeup of the jury pool for these periods and the population of the county as a whole. The studies also sought to determine whether the composition of the jury pool for the periods in question reflected the composition of the county's population by age group. The study was based upon data which had been obtained from the 1970 United States Census.

After the data was adjusted for an undercount of 2 percent for whites and 8 percent for blacks, the population of Wayne County over the age of eighteen was 68.9 percent white and 31.1 percent black. The census data further indicated that those persons between the ages of 18 and 29 made up 33.3 percent of the population which was subject to service as jurors.

The surveys indicate that the 1976-1977 jury pool was 79 percent white and 21 percent black and that the racial composition of the 1978-1979 jury pool was 82.9 percent white and 17.1 percent black. In other words, the two surveys reflected an underrepresentation of blacks by 10.1 percent and 14 percent, respectively. The studies further revealed that members of the 18 to 29-year-old group composed 20 percent of the 1976-1977 jury pool and 22.5 percent of the 1978-1979 jury pool. Again, the surveys demonstrated an under-representation of a segment of the community's population in the amount of 13 percent and 10.5 percent respectively.

At the hearing, the state introduced evidence which established that the Wayne County Jury Commission for 1978-1979 drew

a jury list by selecting every second name from the Wayne County tax roll, excluding non-personal listings of corporations and associations, and every third name from the Wayne County voter registration list. Both sources of data were stored in the facilities of the Wayne Computer Center. At the direction of the jury commission, the computer center provided the commission with data cards which indicated the names and addresses of the persons who had been selected by the computer in accordance with the procedure set out above. The cards contained no information concerning the age or the race of the person so selected. The cards were then locked in the vault of the Wayne County Register of Deeds where they were blindly selected whenever it became necessary to draw a venire.

In all respects, the procedure followed by the Wayne County Jury Commission comported with the statutory requirements for constituting a jury pool *See generally G.S.* §§ 9-1 to -7 (1969 and Cum. Supp. 1979). However, that observation does not serve to resolve the issue in the case *sub judice.* Defendant does not contend that the statutory procedures were not followed but instead argues that his sixth amendment right to trial by jury was infringed upon by the procedure so employed in that it served to deny to him the right to be tried before a jury which was composed of a fair cross-section of the community. Our analysis of the facts of the present case in light of the pertinent case law compels us to disagree.

[1] In order to establish a *prima facie* case that there has been a violation of the requirement that a jury be composed of persons who represent a fair cross-section of the community, defendant must document that the group alleged to have been excluded is a distinctive group; that the representation of the group in question within the venire is not fair and reasonable with respect to the number of such persons in the community; and that this underrepresentation is due to systematic exclusion of the group in the jury selection process. *Duren v. Missouri,* 439 U.S. 357, 58 L. Ed. 2d 579, 99 S. Ct. 664 (1979); *State v. Hough,* 299 N.C. 245, 262 S.E. 2d 268 (1980); *State v. Avery,* 299 N.C. 126, 261 S.E. 2d 803 (1980).

[2] In determining whether a group is distinctive or cognizable for the purposes of a challenge to a jury selection plan, three factors must be weighed as being pertinent to the decision. First, there must be some quality or attribute in existence which defines or limits the membership of the alleged group; second, there must be a cohesiveness of attitudes, ideas, or experiences which serves to

distinguish the purported group from the general social milieu; and third, a community of interest must be present within the alleged group which may not be represented by other segments of the populace. *United States v. Smith*, 463 F. Supp. 680 (E.D. Wis. 1979); *United States v. Guzman*, 337 F. Supp. 140 (S.D.N.Y.), *aff'd*, 468 F. 2d 1245 (2d Cir. 1972), *cert. denied*, 410 U.S. 937 (1973). When defendant's claim is evaluated in light of the relevant considerations, blacks are cognizable as a distinctive group for the purpose of fair cross-section analysis. *Strauder v. West Virginia*, 100 U.S. 303, 25 L. Ed. 664 (1879); *State v. Hough, supra; State v. Avery, supra*. We are unable to conclude, however, that young people between the ages of 18 and 29 constitute such a group.

[3] On numerous occasions, courts have been requested to recognize "young people" as a distinct group for the purpose of determining whether a jury panel represents a fair cross-section of the community. With one exception, *United States v. Butera*, 420 F. 2d 564 (1st Cir. 1970), they have refused to do so. *United States v. Ross*, 468 F. 2d 1213 (9th Cir. 1972), *cert. denied*, 410 U.S. 989 (1973); *United States v. Kuhn*, 441 F. 2d 179 (5th Cir. 1971); *United States v. DiTommaso*, 405 F. 2d 385 (4th Cir.), *cert. denied*, 394 U.S. 934 (1968). If the jury system is to fulfill its historic mission to bring the common sense of the community to the application and enforcement of the substantive law, it is of manifest necessity that the attitudes and perspectives of the pertinent community be fairly represented in the process. *See Ballew v. Georgia*, 435 U.S. 223, 55 L.Ed. 2d 234, 98 S. Ct. 1029 (1978); *Peters v. Kiff*, 407 U.S. 493, 33 L. Ed. 2d 83, 92 S. Ct. 2163 (1972). However, we are unable to agree with defendant's argument that young people between the ages of 18 and 29 bring to the judicial process potentially unique and varied perspectives. We base our decision in this regard on three distinct grounds. First, the parameters of such a group are difficult to ascertain, as evidenced by the widely varying ages which have been used to define it. *See United States v. Ross*, 468 F. 2d at 1217. Second, defendant has failed to demonstrate that the values and attitudes of this purported group are substantially different from those of other segments of the community, nor has he demonstrated that the values and attitudes of the members of the purported group are cohesive and consistent. Third, the membership of the purported group is constantly in flux, with persons aging out of it, as well as growing into it. In other words, an individual is not a member of this group once and for all.

State v. Price

[4]　Though it is settled that blacks constitute a cognizable group for purposes of fair cross-section analysis, and even if we were to accept defendant's argument that young people between the ages of 18 and 29 ought to be deemed such a group, two more elements of the *Duren* test must be established for defendant to successfully challenge the Wayne County jury pool. Not only must the group in question be cognizable, it must also be affirmatively documented that the representation of that group within the venire is not fair and reasonable with respect to the group's presence within the relevant community. That misrepresentation, in turn, must be the result of a systematic exclusion of that group by the jury selection process. It is our conclusion that defendant has utterly failed to meet his burden with respect to either of the latter two prongs of the *Duren* test. *See State v. Hough, supra; State v. Avery, supra; State v. Hardy,* 293 N.C. 105, 235 S.E. 2d 828 (1977).

While it is undisputed that the Wayne County jury pool for the 1978-1979 biennium does underrepresent the percentage of blacks and young people living in the county[1], we are unable to conclude as a matter of law that the applicable percentages are sufficient to establish that the representation of these groups is not fair and reasonable in light of their presence in the community. During this time period, blacks made up 17.1 percent of the jury pool. This representation compares with the fact that the population of Wayne County was 31.1 percent black. In other words, there is an absolute disparity of 14 percent[2]. Turning to the representation of young adults between the ages of 18 and 29, the data indicates that members of this age group comprised 22.5 percent of the jury pool. According to the 1970 United States Census, young people between the ages of 18 and 29 made up 33.3 percent of the population which was subject to service as jurors. Again, there is an absolute disparity of 10.8 percent.

---

[1]Defendant has offered data concerning the 1976-1977 biennium also. While that data is entitled to consideration, particularly regarding a showing of systematic exclusion, it is not determinative of the question posed by this case.

[2]In dealing with allegations that fair representation has been denied, it is appropriate to consider absolute disparity rather than comparative disparity. *See State v. Hough, supra; State v. Brower,* 289 N.C. 644, 224 S.E. 2d 551 (1976).

It is apparent that the data adduced by defendant in support of his challenge indicates a disparity between the presence in the population of Wayne County of blacks and young people and the representation of these groups in the pertinent jury pool. However, a criminal defendant is not entitled to a jury of any particular composition, nor is he entitled to be tried before a jury which mirrors the presence of various and distinctive groups within the community. *Apodaca v. Oregon*, 406 U.S. 404, 32 L. Ed. 2d 184, 92 S. Ct. 1628 (1972); *Fay v. New York*, 332 U.S. 261, 91 L. Ed. 2043, 67 S. Ct. 1613 (1947). In other words, the right to trial by jury carries with it the right to be tried before a body which is selected in such a manner that competing and divergent interests and perspectives in the community are reflected rather than reproduced absolutely. *Taylor v. Louisiana*, 419 U.S. 522, 42 L. Ed. 2d 690, 95 S. Ct. 692 (1975). In the present case, the disparity which is demonstrated by the data does not establish that the components of the population of Wayne County are not reflected fairly and reasonably in the jury pool. We are compelled to observe that the disparity about which defendant now complains is not significantly greater than that which we approved in *State v. Avery, supra*, where there was an underrepresentation of blacks of 9 percent, or *State v. Cornell*, 281 N.C. 20, 187 S.E. 2d 768 (1972), where the disparity which was challenged amounted to 10 percent.

Nor do we conclude that the underrepresentation is the product of systematic discrimination. When a defendant makes a sixth amendment challenge alleging that the jury pool does not represent a fair cross-section of the community, there is no requirement that a discriminatory purpose or intention be proven. *Duren v. Missouri*, 439 U.S. at 366, 58 L. Ed. 2d at 588, 99 S. Ct. at 669; *State v. Avery*, 299 N.C. at 141, 261 S.E. 2d at 812 (Exum, J., dissenting). Instead, it must be demonstrated that the absence of a fair cross-section of the community in the process is the inherent product of the particular method of selection utilized. *Duren v. Missouri, supra*.

Defendant has failed to demonstrate that the data base employed in Wayne County inevitably dictates an unfair and unreasonable underrepresentation of blacks and young adults. Similarly, defendant has not established that the data base was employed in such a manner as to forecast underrepresentation of the groups in question. No single data base can assure complete representation of the community. To so demand is unreasonable because that is not the pertinent objective. Rather, the data base

must be such that the competing perspectives in the community are given a reasonable opportunity to participate in the judicial process through service on a jury. The usage of property tax listings and voter registration records serves to create a broad, as well as an extensive, data base which may be appropriately employed so that this objective may be fulfilled.

In that he has failed to establish the *prima facie* case set forth by *Duren v. Missouri, supra,* we conclude that defendant's challenge to the Wayne County jury pool is without merit.

By his second assignment of error, defendant contends that the trial court erred by excluding evidence which purportedly bolstered his claim of self-defense. There are two prongs to this argument. Initially, defendant maintains that the trial court erred in excluding the testimony of three law enforcement officers concerning statements defendant made to them at the time of his arrest and shortly thereafter concerning the double homicide in Wayne County. Second, defendant asserts that the trial court erred in excluding evidence concerning decedent Glenn Cashwell's predisposition to violent behavior. Neither argument is meritorious.

[5] Defendant's initial challenge is directed at the testimony of three law enforcement officers: Officer Johnston Livingston of the Stantonsburg Police Department, Sergeant Ronnie Batts of the Wilson County Sheriff's Department, and Special Investigator Stan Flowers of the Wayne County Sheriff's Department. Officer Livingston arrested defendant after he and Officer Roger Reason of the Stantonsburg Police Department had stopped his car. Sergeant Batts arrived shortly thereafter and assisted in handcuffing defendant, after which he transported defendant to the sheriff's office in Wilson. Officer Livingston was asked on cross-examination whether defendant had told him at the time of the arrest that the killings had been in self-defense. The objection of the state was sustained, and the officer answered for the record, in the absence of the jury, that defendant had told him that he had acted in self-defense. Sergeant Batts was asked the identical question, and he answered the question affirmatively before the state could interpose an objection. The subsequent objection by the district attorney was sustained and the jury was given a limiting instruction. Special Investigator Flowers was asked on cross-examination whether defendant had told him that Mrs. Cashwell had a shotgun in her possession at the time of the shooting.

The statement to the officers at the time of defendant's arrest that the shooting had been in self-defense was properly excluded from the consideration of the jury. The statement was inadmissible as substantive evidence because of its hearsay character. *See generally* 1 Stansbury's North Carolina Evidence §§ 138, 140 (Brandis Rev. 1973). The characterization by the state of the statement in question as "self-serving" is an insufficient response to the argument. The statement was incompetent as substantive evidence in that it failed to come within any of the generally recognized exceptions to the hearsay rule. Nor was the statement admissible as corroborative evidence in that defendant had not yet taken the stand and testified in that manner.

Regarding the objection to the inquiry which had been directed at Special Investigator Flowers, we are compelled to observe that defendant has failed to make his record by making the answer that the witness would have given part of the record of the proceedings at trial. When an objection to a specific question asked on cross-examination is sustained, the answer the witness would have given must be made part of the record or the propriety of the objection will not be considered on appeal. *E.g., State v. Martin,* 294 N.C. 253, 240 S.E. 2d 415 (1978). Otherwise, this court is capable only of speculating as to what the answer of the witness would have been and whether the challenged evidentiary ruling was prejudicial.

**[6]** By the second prong of his argument, defendant contends that the trial court erred by excluding evidence concerning the predisposition to violent behavior of decedents Glenn and Barbara Cashwell. It is the general rule that where the defendant in a homicide prosecution pleads self-defense and there is evidence which tends to show that the killing was in self-defense, evidence of the character of the deceased as a violent and dangerous fighting person is admissible if such character was known to the defendant or the evidence is wholly circumstantial or the nature of the transaction is in doubt. *E.g., State v. Barbour,* 295 N.C. 66, 243 S.E. 2d 380 (1978); *see generally* 1 Stansbury's North Carolina Evidence § 106 (Brandis Rev. 1973). We do not question the continued viability of this principle. However, our examination of the record leads us to conclude that the record will not support defendant's assertions of error.

On cross-examination, Billy Cashwell was asked whether it was true that his father had been fired from Georgia-Pacific for striking another foreman. On direct examination, defendant himself

was asked if he knew why Glenn Cashwell was unemployed on the day of the incident. In both instances, the objections of the state were sustained. In neither instance was the answer which the witness would have given placed in the record for our consideration. Accordingly, these particular exceptions will not be considered on appeal. *E.g., State v. Martin, supra.*

On direct examination, defendant testified that after he had let Billy Cashwell enter his trailer through the back door, the telephone rang. Billy answered the call and told defendant that it was his sister, Mrs. Williams. Thereupon defendant testified that his sister told him during the conversation that Mrs. Cashwell had gone to her home and had tried to fight her. At that point, the district attorney objected, and the presiding judge sustained the objection. However, there was no motion to strike made, and the judge did not instruct the jury that it was to disregard the testimony in question. Accordingly, the evidence was before the jury notwithstanding the objection, and defendant cannot reasonably complain of prejudicial error.

During the direct examination of defendant, he testified that he had occasion to hear the workers at Georgia-Pacific discuss Glenn Cashwell and that decedent had a reputation for violence among the workers at the plant. Thereupon, the following exchange took place:

Q. What was that reputation?
MR. JACOBS: OBJECT
A. The same thing.
THE COURT: OBJECTION SUSTAINED
EXCEPTION NO. 22.

Defendant asserts that for the court to have sustained the objection of the state was error in that it denied him the opportunity to present evidence of decedent's violent disposition. First, we again note that there was no motion to strike. Therefore, the evidence was before the jury for its consideration because of the absence of an instruction directing them to disregard the testimony, and there was no prejudice in the sustaining of the objection. Second, the question was subject to challenge in that it was repetitive because it immediately followed another question of the same import. *See State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1 (1966), *cert. denied,* 386 U.S. 911 (1967).

Lastly, on redirect examination, defendant was asked whether he had heard from his sister, Mrs. Williams, on the afternoon of 22 May 1979 concerning Mrs. Cashwell. The objection of the state was sustained, and the jury was excused. Over the renewed objection of the state, defendant testified for the record that his sister had told him that Mrs. Cashwell had been "pushing her around, wanting to fight her." While this testimony is arguably relevant as to the predisposition toward violence of Mrs. Cashwell, we perceive no prejudice in its exclusion. The same evidence had already been placed before the jury during defendant's direct examination. Furthermore, the incident was not the subject of any inquiry on cross-examination of defendant by the district attorney. While the objective of redirect examination is to clarify the subject matter of the direct examination and any new matter elicited on cross-examination, *see, e.g., State v. Cates*, 293 N.C. 462, 238 S.E. 2d 465 (1977), it ought not be used by counsel as a vehicle for merely repetition of evidence which is already before the trier of fact and which has not been challenged in any way during the presence of the particular witness on the stand.

**[7]** Defendant further contends that the trial court erred in receiving certain testimony offered by Special Investigator Flowers. The officer testified that he had received a shotgun from an uncle of Billy Cashwell's three months after the shootings. Billy had previously testified himself that he had taken a shotgun down from the family's gun rack and had gone to the front door with it, but he had put the weapon aside when ordered to do so by defendant. During an interrogation, Billy told the investigator about the weapon, and he had been told that the officers who were investigating the incident needed the weapon. A short time later, Royce Roberts, an uncle of Billy's who actually owned the weapon, delivered the gun to the authorities. Over objection, Officer Flowers testified that he had unsuccessfully attempted to test-fire the weapon. More specifically, he attempted to fire the weapon with five different shotgun shells at least three times each. Defendant asserts that this testimony was prejudicial error in that the "weapon obviously could have been used, tampered with, worked on or otherwise mistreated during the three-month period it was missing." Defendant concludes that the results of any such test-firing were irrelevant and immaterial to the inquiry made by the jury. We disagree.

It is an established principle that in a criminal case, every circumstance which is reasonably calculated to throw light upon the alleged crime is admissible. *E.g., State v. Bundridge*, 294 N.C. 45, 239

S.E. 2d 811 (1978). During his direct examination, Billy Cashwell testified that the spring on the gun was weak and that as a result the firing mechanism would not discharge a shell. The testimony of Officer Flowers served to flesh out the account Billy offered concerning his conduct during the incident. Also, assuming, *arguendo*, that the relevance of this evidence is too attenuated for it to have been properly placed before the jury, defendant has failed to demonstrate how this evidence was prejudicial to his interests.

[8]  By his fourth assignment of error, defendant contends that the trial court erred in removing a juror, arguing that this action amounted to an abuse of discretion in that no grounds existed upon which to justify the action. It is our conclusion that the conduct of Judge Rouse in this regard was proper and served to prevent the trial proceedings from being subjected to even the slightest taint of suspicion.

On 5 November 1979, defense counsel was at his home asleep on the couch when he was called to the telephone by his thirteen-year-old son who told him that a woman had asked to speak with him. The attorney went to the phone and discovered that the caller was a female juror in the present case. The woman had called the attorney about thirty minutes earlier but had told the son, who had answered that call as well, not to disturb the lawyer when she had been informed that he was asleep. When the second call was received the son had awakened his father thinking that the matter was fairly important to have the same individual call again so quickly. During the second phone call, the woman persisted in discussing matters of a personal nature with defendant's counsel, including his marital status. The attorney was able, after a short while, to end the conversation.

The next day, the attorney informed the presiding judge about the incident. Thereupon, Judge Rouse convened a hearing in chambers on Monday morning, 7 November 1979, before defendant's trial resumed after the weekend recess. After hearing the lawyer's account of the incident, the judge made findings of fact and concluded that the juror in question ought to be removed from the panel so as to assure a fair trial for defendant. When court reconvened, the alternate juror was substituted for her.

G.S. § 15A-1215(a) provides that the trial judge may substitute an alternate juror for another juror if the latter dies, becomes

incapacitated or disqualified, or is discharged for any reason before final submission of the case to the jury. The exercise of this power rests in the sound discretion of the trial judge and is not subject to review absent a showing of an abuse of discretion. *State v. Nelson,* 298 N.C. 573, 260 S.E. 2d 629 (1979); *State v. Waddell,* 289 N.C. 19, 220 S.E. 2d 293 (1975), *death sentence vacated,* 428 U.S. 904 (1976). This discretion ought to be used to the end that both the state and defendant receive a fair trial. *State v. Nelson, supra; State v. McKenna,* 289 N.C. 668, 224 S.E. 2d 537, *death sentence vacated,* 429 U.S. 912 (1976).

One of the basic precepts of professional responsibility is that during the trial of a case, an attorney who is involved in the matter shall not communicate with any member of the jury. DR 7-108(B)(1). Otherwise, the impartiality of the tribunal which is at the foundation of the judicial process would be threatened, and the public's confidence in that process would be undermined. EC 7-29. A concurrent ethical obligation is imposed upon an attorney to report to the court any improper conduct by a juror of which the attorney has knowledge. DR 7-108(G). The conduct of trial counsel in this regard was above reproach. While there is no evidence that any matter which related to the trial of defendant was discussed during the conversation, the exercise of discretion by Judge Rouse served to safeguard the trial of defendant from even the appearance of impropriety. *See* EC 9-6.

[9] By his fifth assignment of error, defendant contends that the trial judge impermissibly expressed an opinion of the case before the jury on three separate occasions. We have carefully reviewed the record and conclude that there was nothing improper about the conduct of Judge Rouse.

First, defendant alleges that the trial judge expressed an opinion on the credibility of defendant and those of his relatives who testified on his behalf. During his charge, Judge Rouse instructed the jury in the following manner:

When you come to consider the evidence and the weight you will give to the testimony of the different witnesses, I instruct you that it is your duty to carefully consider and scrutinize the testimony of the defendant when he testifies in his own behalf; and also the testimony of those who are closely related to him. In passing upon the testimony of such witnesses, the jury ought to take into consideration the interest the witness has in the

result of the action, but I instruct you that the law requires you to do so does not require you to object or impeach such evidence; and if you believe that such witness or witnesses have sworn to the truth, you will give to his or their testimony the same weight you would do that of any disinterested or unbiased witness. (R.p. 161).

The identical instruction was expressly approved by this court in *State v. Eakins*, 292 N.C. 445, 233 S.E. 2d 387 (1977), and we are not disposed to reexamine the propriety of that decision.

Second, defendant contends that the trial judge expressed an opinion by failing to reinstruct the jury on the elements of self-defense when the jury on two occasions returned to the courtroom and requested additional instructions on first-degree murder, second-degree murder, felony murder, and discharging a firearm into an occupied building. Defendant contends that the judge's failure to repeat the pertinent instructions as to self-defense amounts to an expression of his opinion on the viability of that plea. This argument is without merit in that once a trial judge has complied with a request by the jury for additional instructions on a particular point of law, it is not necessary that he also repeat his instructions as to other features of the case which have already been correctly given. *State v. Dawson*, 278 N.C. 351, 180 S.E. 2d 140 (1971).

Third, defendant argues that Judge Rouse expressed an opinion by instructing the jury that in the event defendant was convicted of first-degree murder, a separate sentencing proceeding would be conducted to determine whether defendant would be sentenced to life imprisonment or to death. The judge went on to instruct the jury that their only concern at that point in the proceeding was to determine the issue of defendant's guilt or innocence. We do not agree with defendant's contention that for Judge Rouse to have so instructed was an expression of disbelief in defendant's claim of self-defense. G.S. § 15A-2000 *et seq.* contemplates a bifurcated proceeding in capital cases. It is only upon a guilty verdict that the second stage of the proceeding is convened. The instruction about which defendant now complains did nothing more than serve to acquaint the jury with the procedure which was to be followed upon their return of a verdict which found defendant guilty of first-degree murder. We cannot perceive that the judge's comments precipitated a rush to judgment by the jury.

By his sixth and seventh assignments of error, defendant has preserved twenty-nine exceptions which are directed at portions of Judge Rouse's charge not previously discussed in this opinion. We have carefully examined these instructions contextually and find them to be without prejudicial error.

There was no error in the denial of defendant's motion to set aside the verdicts as being against the evidence. There was plenary evidence brought forward at trial by the state to establish its *prima facie* cases. Defendant was effectively and zealously represented by competent counsel.

In defendant's trial and in the judgements appealed from, we find

No error.

Justice BROCK did not participate in the consideration or decision of this case.