An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-770

Filed 3 June 2026

Craven County, Nos. 19CR050987-240, 21CR000093-240

STATE OF NORTH CAROLINA

v.

LAJARVIS MARQUEZ JONES

Appeal by defendant from judgment entered 18 January 2024 by Judge Craig Croom in Craven County Superior Court. Heard in the Court of Appeals 20 May 2026.

*Attorney General Jeff Jackson, by Assistant Attorney General Allison J. Newton, for the State.*

*MK Mann Law, by Mikayla Mann, for defendant-appellant.*

ARROWOOD, Judge.

Lajarvis Jones ("defendant") appeals from judgment entered upon his conviction for possession of a controlled substance on the premises of a penal institution and attaining habitual felon status. For the following reasons, we discern no error and affirm defendant's convictions.

I.     Background

Defendant was incarcerated at Craven Correctional Institution ("CCI"). CCI is divided into housing units which each include four different "blocks" where inmates sleep. The dorms are connected to the other areas of the prison through sallyports which have doors on either end that can only be opened by CCI's Central Control. Inmates at CCI are assigned to specific housing units and wear colored wristbands to designate their assigned block. Each inmate also wears prison-issued cargo pants with long pockets.

On 28 March 2019, Officer Mikayla Sykes was working in CCI's Hatteras housing unit. Officer Sykes had also been assigned to the same housing unit the day prior and conducted rounds every hour. Officer Sykes saw defendant inside Hatteras B block and did not recognize him as one of the inmates assigned to the Hatteras unit. Defendant attempted to step out of the B block and Officer Sykes directed a control officer to let defendant into the sallyport. Officer Sykes asked defendant where he slept, and he responded that he slept in Bed 12. Officer Sykes testified she knew that defendant was not assigned to Bed 12 but could not remember how she knew.

Finding it suspicious that defendant was in Hatteras B block, Officer Sykes initiated a pat-frisk search of defendant's person. Officer Sykes instructed defendant to keep his hands on the wall during the search, but defendant kept lowering his right hand to go into his pants pocket. When she patted down defendant's right pants pocket, Officer Sykes felt something. She reached into his pants pocket and pulled out a piece of orange substance wrapped in clear cling wrap. Officer Sykes described

the orange substance as small, "[a] little bigger than a pinky nail." She found other items in defendant's pocket but none of them were improper.

Through her work, Officer Sykes was familiar with buprenorphine, or "suboxone," which she described as "an orange strip that melts on the tongue or underneath the tongue" and can give the user a high. CCI did not allow inmates to possess suboxone. Officer Sykes confiscated the orange strip in defendant's pocket and called for assistance. The Officer in Charge, Lieutenant Kelvin Windley took pictures of the orange strip then placed the orange strip in an envelope, stapled a contraband report to it, and put it in a contraband locker. The contraband was turned over to local law enforcement on 1 April 2019.

The orange strip was then tested by Expert Forensic Chemist Jamie Weathers of the North Carolina State Crime Lab. She described the strip as "an orange piece of paper" with no pharmaceutical markings. Ms. Weathers weighed the orange strip and it did not register a weight due to its small size. A preliminary color test of the strip indicated the presence of an opiate-type substance. Ms. Weathers then analyzed a sample of the orange strip using a gas chromatograph-mass spectrometer which confirmed the presence of buprenorphine, a controlled substance.

On 1 March 2021, defendant was indicted for possession of a controlled substance on the premises of a penal institution in violation of N.C.G.S. § 90-95(e)(9) and attaining habitual felon status. The matter went to trial on 16 January 2024. On 17 January 2024, it was brought to the attention of the trial court that Juror #1

was seen speaking with an unknown man who had previously been seen in the courtroom during the trial. The man was reportedly there for a family member's trial.

The trial court questioned Juror #1 under oath to investigate any potential misconduct. Juror #1 testified that he had met the man the day before and they had a conversation. On the day of Juror #1's testimony, the man spoke again after Juror #1 initiated a conversation by saying "What's up." The conversation lasted around 30 seconds to one minute. When asked what they spoke about, Juror #1 testified that the man asked him how long jury duty takes and told him that he was there to "pick up one of his people."

The trial court explained to Juror #1 that he could face the penalty of perjury and asked if the unknown man would testify differently if asked about their conversation. Juror #1 said that the unknown man would not testify about anything different. The unknown man had already exited the building and consequently did not testify about the conversation with Juror #1.

The State proposed removing Juror #1 and seating an alternate juror out of an abundance of caution. Defendant opposed the removal of Juror #1 because his conversation with the unknown man appeared to be innocuous and defendant had no family in the area, so there was no reason to think the man was connected to defendant. The trial court stated that though it had some concerns, Juror #1 had not technically broken any of the trial court's rules regarding who the jurors could communicate with. Those rules included not discussing the case with friends and

family and not communicating with parties, attorneys, or witnesses involved in the case. Accordingly, the trial court initially did not remove Juror #1 but indicated that they might revisit the issue at another time.

However, the State soon after informed the trial court that an officer, Deputy Nelson, was previously stopped by a young man asking when court would resume after lunch. Deputy Nelson wondered if it was the same person who spoke to Juror #1, so he conferred with Deputy Hill, who originally observed Juror #1's conversation. Deputy Nelson concluded that the young man matched the description of the unknown man that had spoken to Juror #1. Deputy Nelson later watched a video of the man's conversation with Juror #1 and testified that they appeared to be the same person. He was unable to provide any additional information about why the man was asking and whether he was inquiring specifically about when the jurors would be back or simply when court would resume.

The trial court revisited the issue in its entirety and called Deputy Hill to testify. Deputy Hill stated that his Captain had mentioned that the man was in the audience and exhibited suspicious behavior. Deputy Hill watched the man as he spoke to Juror #1 and said that the conversation appeared personal or private, as if they knew each other. After that conversation, Deputy Hill asked the man why he was there. The man said his family member was on trial and that his family member was not defendant. At the State's request, the trial court also called Major McFadyen, who observed Juror #1 after he testified about his conversation. Major McFadyen

stated that Juror #1 "had a frown on his face" and "did not appear to be very happy."

The trial court, defendant, and the State also watched a video of Juror #1's conversation with the man. The video had no audio. The State argued that the video was concerning because it showed the jury being dismissed, at which point the trial court always instructs everyone else to remain seated. However, the man waited near where the jury exited and Juror #1 and the man were in contact with each other almost immediately after the jury was dismissed. Additionally, the State argued that Juror #1's demeanor after being questioned could indicate that the inquiry left "a bad taste in his mouth" and he might "hold that against the State or the defendant[.]" Defendant's counsel agreed that the video showed Juror #1 going "virtually directly to" the man. Defendant's counsel also said that as an officer of the court, they had a concern with leaving Juror #1 on the jury, but as defendant's zealous advocate, their position that Juror #1 should not be removed remained unchanged.

The trial court found that there were "too many coincidences in this case in terms of the behavior of Juror #1 and the unnamed man who was in the back of the courtroom." Accordingly, the trial court found that the incident constituted misconduct on the part of Juror #1. Juror #1 was dismissed and replaced with an alternate.

At the conclusion of trial on 18 January 2024, the jury found defendant guilty of possession of a controlled substance on the premises of a penal institution. Defendant then pled guilty to attaining habitual felon status and was sentenced to

96 to 128 months imprisonment. Defendant provided notice of appeal to this Court in open court.

## II. Discussion

Defendant raises two issues on appeal: 1) whether the trial court erred by denying his motion to dismiss his possession charge; and 2) whether the trial court abused its discretion by dismissing Juror #1 and replacing him with an alternate. For the following reasons, we hold that the trial court did not err.

### A. Standard of Review

"This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62 (2007) (citations omitted). "Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied." *State v. Fritsch*, 351 N.C. 373, 378 (2000) (quoting *State v. Powell*, 299 N.C. 95, 98 (1980)). Substantial evidence exists if there "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78 (1980) (citations omitted). "In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose*, 339 N.C. 172, 192–93 (1994) (citations omitted).

We review a trial court's decision to remove an impaneled juror for abuse of discretion. *State v. Davis*, 325 N.C. 607, 628 (1989); *State v. Knight*, 262 N.C. App. 121, 129 (2018). "[T]he trial court's determination is only an abuse of discretion if it was manifestly unsupported by reason and is so arbitrary that it could not have been the result of a reasoned decision." *State v. Gillard*, 386 N.C. 797, 853 (2024) (cleaned up).

### B.      Motion to Dismiss

Defendant contends that the State presented insufficient evidence that he violated N.C.G.S. § 90-95(e)(9).  Specifically, defendant argues that since the buprenorphine strip had no weight or identifying markings, the State failed to demonstrate that he was aware of the strip in his pocket.  Defendant likens the small strip to residue and argues that additional evidence beyond the strip being found in defendant's pocket is necessary to show that he was aware of its presence and that it was a controlled substance.

N.C.G.S. § 90-95(a)(3) states that it is unlawful for any person "[t]o possess a controlled substance."  In turn, § 90-95(e)(9) states that "[a]ny person who violates G.S. 90-95(a)(3) on the premises of a penal institution or local confinement facility shall be guilty of a Class H felony."  Thus, to overcome defendant's motion to dismiss, the State had to provide substantial evidence that defendant (1) possessed a controlled substance (2) in a penal institution.  It is undisputed that defendant was in a penal institution and that buprenorphine is a controlled substance.

"Possession may be either actual or constructive. Actual possession requires a party to have physical or personal custody of the item." *State v. Bowens*, 140 N.C. App. 217, 222 (2000) (citations omitted). For example, a person has actual possession of items found on their person. *See id.* at 223. Meanwhile, "[c]onstructive possession occurs when a defendant has 'the intent and capability to maintain control and dominion over [the contraband].' " *State v. McNeil*, 294 N.C. App. 233, 236 (2024) (quoting *State v. Miller*, 363 N.C. 96, 99 (2009)).

"To convict a defendant of possessing a controlled substance," the State must also prove "that defendant *knowingly* possessed the substance." *State v. Crudup*, 157 N.C. App. 657, 662 (2003) (emphasis added). Actual possession can itself "giv[e] rise to the inference defendant knowingly possessed the [controlled substance]." *State v. Johnson*, 124 N.C. App. 462, 468 (1996). For example, in *Johnson*, this Court held that testimony from an investigator stating that he recovered a bag containing 2.1 grams of cocaine from the defendant's right front pants pocket was substantial evidence that the defendant knowingly possessed the cocaine. *Id.*

Possession of a controlled substance is unlawful regardless of the amount involved. *State v. Thomas*, 20 N.C. App. 255, 257 (1973). Accordingly, "[t]his Court has previously held that a residue quantity of a controlled substance, despite its not being weighed, is sufficient to convict a defendant of possession of the controlled substance . . . ." *State v. Williams*, 149 N.C. App. 795, 798–99 (2002) (citing *Thomas*, 20 N.C. App. 255). However, the amount possessed may still be relevant to

defendant's knowledge. For example, in *Thomas*, the defendant possessed a bottle cap containing mere traces of heroin. *Thomas*, 20 N.C. App. at 257–58. This Court held that evidence of defendant's familiarity with heroin was relevant because "[p]ossession of a bottle cap containing a residue as described in the evidence in this case by a person unfamiliar with the uses of heroin might well be consistent with innocent possession because of lack of knowledge by the possessor of the contraband nature of the article possessed." *Id.* at 258.

Defendant provides other examples of cases involving mere residue in which there was circumstantial evidence outside of the defendant's possession demonstrating knowledge. In *Williams*, the defendant was apprehended "at a known drug house after he absconded with a house arrest unit around his ankle" and possessed a piece of drug paraphernalia containing cocaine residue. 149 N.C. App. at 797. Additionally, in *State v. Davis*, 186 N.C. App. 242, 247–48 (2007), residue of methamphetamine was found in the defendant's home and the defendant voluntarily stated that the police found meth in his house that he used for pain relief. However, in neither of those cases, nor in *Thomas*, did this Court find that the additional circumstantial evidence was necessary to survive a motion to dismiss.

Here, defendant had actual possession of the buprenorphine strip because it was found in his pants pocket. We hold that despite the strip's small size and lack of pharmaceutical markings, defendant's actual possession is sufficient to give rise to the inference that defendant knowingly possessed the controlled substance.

Moreover, even assuming *arguendo*, that additional circumstantial evidence was needed to survive a motion to dismiss, the State met that burden. The State's evidence that the buprenorphine strip was protectively wrapped in cling wrap and defendant repeatedly lowered his hand to the pocket where the strip was found during the search suggests that defendant knew that the buprenorphine strip was in his pocket and was a controlled substance. Altogether, the State presented substantial evidence that defendant knowingly possessed the buprenorphine strip. Accordingly, the trial court did not err by denying his motion to dismiss.

## C.    Dismissal of Juror #1

Defendant argues that the trial court abused its discretion in dismissing Juror #1 because Juror #1 did not engage in misconduct by speaking with an uninterested party. Defendant further alleges that the trial court failed to follow best practices when it allowed the testifying deputies to hear the testimony of other witnesses.

N.C.G.S. § 15A-1215(a) allows an alternate juror to be seated and replace any juror that "dies, becomes incapacitated or disqualified, or is discharged" prior to a verdict being rendered. Trial courts may discharge a juror based on misconduct. *See State v. Nobles*, 297 N.C. App. 719, 722 (2025); *State v. Drake*, 31 N.C. App 187, 190–91 (1976). Our Supreme Court has also upheld juror substitutions made "to safeguard the trial of defendant from even the appearance of impropriety." *State v. Price*, 301 N.C. 437, 453–54 (1980).

"When allegations of juror misconduct are made, the trial court must make

'such investigations as may be appropriate' to determine if misconduct has occurred and if the defendant has been prejudiced." *State v. Galbreath*, 295 N.C. App. 523, 527 (2024) (quoting *Drake*, 31 N.C. App. at 191). "[Q]uestions of juror misconduct and its effect depend on facts and circumstances specific to the case." *Id.* (citation omitted). "[T]he trial court is in the best position to examine the facts and circumstances" due to its ability to "question witnesses and observe their demeanor, and make appropriate findings." *Id.* at 527, 529 (citation omitted); *see also Knight*, 262 N.C. App. at 129. Accordingly, "we give great weight to its determination of whether juror misconduct occurred" and rarely disturb trial court rulings on juror misconduct where the court conducted a sufficient investigation. *Galbreath*, 295 N.C. App. at 527–29.

Here, the State made an allegation of juror misconduct and the trial court properly responded by conducting a thorough investigation. The trial court considered testimony from several witnesses including deputies and the juror himself. The trial court also reviewed a video of Juror #1 speaking to the unknown man and found that the man had been waiting for the jury to come down, and Juror #1 went over to him and engaged in conversation. The trial court allowed the State and defendant to be heard on the matter. Both the State and defendant's attorney expressed at least some level of concern that leaving Juror #1 on the jury would invite error into the proceedings.

While defendant argues that the investigation was impaired by the fact that the deputies could hear the other testimony, defendant concedes that there is no strict

requirement that the witnesses be separated. Notably, the trial court had no advance notice that each of the deputies would be relevant witnesses in order to separate them. Deputy Nelson only realized that his conversation with the man was significant after he heard Juror #1's testimony, and the State first requested to question Major McFadyen after Deputy Nelson and Deputy Hill had provided their testimonies. Additionally, the trial court's finding of misconduct was also supported by Juror #1's testimony and the video which were not affected by the deputies' testimony. In light of these circumstances, we conclude that the trial court conducted a sufficient investigation into Juror #1's misconduct. Accordingly, we give great weight to its finding of misconduct.

Defendant relies on Juror #1's testimony to argue that no misconduct actually occurred because the contents of Juror #1's conversation with the man was innocuous. However, the trial court had discretion to assess the juror's credibility and weigh his testimony with the other evidence. Moreover, even without testimony that the contents of juror #1's conversation was improper, the conversation created the appearance of impropriety and the trial court acted reasonably in safeguarding the trial by removing Juror #1. *See Price*, 301 N.C. at 453–54. Therefore, we hold that the trial court did not abuse its discretion by dismissing Juror #1 and substituting him with an alternate.

## III. Conclusion

For the foregoing reasons, we affirm defendant's convictions.

NO ERROR.

Judges TYSON and GRIFFIN concur.

Report per Rule 30(e).