STATE OF NORTH CAROLINA v. LIONEL LEWIS ROGERS

No. 373A00

(Filed 10 May 2002)

### 1. Venue— motion to change—pretrial publicity

The trial court did not abuse its discretion in a first-degree murder, first-degree burglary, and first-degree sexual offense prosecution by denying defendant's motion to change venue under N.C.G.S. § 15A-957 based on pretrial publicity including several newspaper articles and a broadcast television report about the murder, because defendant's general allegations that the attention devoted by local media tainted the jury pool in this case failed to establish the particularized prejudice necessary to support a change of venue.

### 2. Jury— motion for individual selection of jurors—improper comments

The trial court did not err in a first-degree murder, first-degree burglary, and first-degree sexual offense prosecution by denying defendant's motion for individual selection of jurors even though defendant contends several prospective jurors tainted the pool by allegedly expressing improper opinions as to defendant's guilt or the outcome of the trial while other prospective jurors were listening, because: (1) the trial court maintained control over the jury selection process, intervening to ask questions as necessary and clarifying matters to the prospective jurors as appropriate; (2) the trial court interrupted on at least one occasion when a prospective juror appeared to be on the verge of making an improper comment and allowed challenges for cause as to jurors who were unable to follow the law; (3) the trial court instructed the prospective jurors to disregard improper comments; and (4) a judge who observes the prospective juror's demeanor as he responds to questions and efforts at rehabilitation is best able to determine whether the juror should be excused for cause.

### 3. Identification of Defendants— photographic lineup—motion to suppress

The trial court did not err in a first-degree murder, first-degree burglary, and first-degree sexual offense prosecution by denying defendant's motion to suppress a witness's identification

of defendant in a photographic lineup, because: (1) defendant was not impermissibly photographed since he came to the police station voluntarily and was not under arrest or in custody when photographed; (2) the photographic identification process was not suggestive since the witness was shown an array of six photographs, including the photograph taken of defendant that day, and the witness quickly selected defendant's photograph; (3) the witness identified defendant in court as the man she saw at the victim's home; and (4) although defendant is the only one in the photo array not standing before a grid of horizontal lines, a photographic lineup is not impermissibly suggestive merely based on the fact that defendant has a distinctive appearance, and none of the men in the photo array appears particularly distinctive in comparison with any of the others.

**4. Identification of Defendants— in-court—motion to suppress**

The trial court did not err in a first-degree murder, first-degree burglary, and first-degree sexual offense prosecution by denying defendant's motion to suppress a witness's in-court identification of defendant as the perpetrator of the crime, because: (1) the witness had the opportunity to view the perpetrator of the crime from a distance of approximately forty feet for several seconds on two occasions; (2) although it was night, lighting was adequate to allow the witness to see the man's face and the witness's eyesight was good; (3) the witness was paying close attention and shortly thereafter provided a detailed description to the investigators; and (4) at the suppression hearing, the witness was careful to ask to see defendant without his hat before committing herself and then was confident of her identification.

**5. Jury— challenges for cause—familiarity with defendant— opposition to death penalty**

The trial court did not abuse its discretion in a first-degree murder, first-degree burglary, and first-degree sexual offense prosecution by excusing two prospective jurors for cause after voir dire, because: (1) one of the prospective jurors stated unambiguously and without prodding by the court that she would be unable to return a verdict of guilty, and the trial court also learned that the prospective juror knew defendant personally, was a friend of defendant's mother, had misgivings about serving on the jury, and left the court with the definite impression that this prospective juror would be unable to faithfully and impar-

tially apply the law; and (2) the second prospective juror revealed his inability to serve on a capital jury.

### 6. Jury— peremptory challenges—racially neutral reasons

The trial court did not abuse its discretion in a first-degree murder, first-degree burglary, and first-degree sexual offense prosecution by overruling defendant's objections to the prosecutor's peremptory challenges of several African-American jurors based on alleged racial discrimination, because the prosecutor gave racially neutral reasons including that: (1) one prospective juror was dismissed because the juror knew defendant's mother and was ambivalent about sitting in judgment; (2) another prospective juror's spouse had worked for one of defendant's counsel; (3) another prospective juror had a history of problems with the law and may have been mentally challenged; (4) another prospective juror seemed uncomfortable with the law and unwilling to participate in the trial; (5) another prospective juror had a prior DWI and seemed to the prosecutor to be weak on the death penalty; and (6) another prospective juror also appeared to be mentally challenged and had a family history of encounters with the law.

### 7. Jury— excusal—age

The trial court did not abuse its discretion in a first-degree murder, first-degree burglary, and first-degree sexual offense prosecution by excusing two prospective jurors over the age of sixty-five based on their age, because: (1) both prospective jurors asked to be excused, and N.C.G.S. § 9-6.1 allows a person over sixty-five years of age to be excused if they ask to be excused; (2) citizens over the age of sixty-five do not make up a distinctive group for the purposes of determining whether defendant was denied his right to have a jury selected from a cross-section of the community as guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section 26 of the North Carolina Constitution; and (3) the rational basis of the General Assembly's decision to allow trial judges to excuse jurors on the basis of advanced age is readily apparent when the adverse affects of growing old do not strike all equally or at the same time.

### 8. Constitutional Law— effective assistance of counsel—failure to object

A defendant in a first-degree murder, first-degree burglary, and first-degree sexual offense prosecution did not receive inef-

fective assistance of counsel based on defense counsel's failure to object when the trial court excused two prospective jurors over sixty-five based on their age, because: (1) the trial court acted properly by excusing the jurors; and (2) there is no evidence in the record suggesting that the two jurors who were excused would have led the other jurors to a different verdict if they had been selected to sit on this case in light of the strong evidence of defendant's guilt.

**9. Criminal Law— defendant's pro se motion—failure to conduct a hearing**

The trial court did not err in a first-degree murder, first-degree burglary, and first-degree sexual offense prosecution by failing to conduct a hearing on defendant's pro se motion during trial, because: (1) most of the allegations in defendant's filing involved conclusory claims that are best addressed during a trial and by cross-examination, including that defendant was discriminated against based on his race, that witnesses lied, that the investigators paid witnesses to perjure themselves, and that defendant was innocent; (2) the issues raised by defendant such as the admissibility of his statements to investigators were handled in pretrial proceedings; and (3) although defendant's filing was extraordinary and did not require any action by the court, the trial judge conscientiously allowed defendant to present his case before a neutral and detached magistrate.

**10. Criminal Law— prosecutor's argument—defendant's exercise of his right not to testify or produce evidence—failure to rebut the State's evidence**

The trial court did not err by failing to intervene ex mero motu in a first-degree murder, first-degree burglary, and first-degree sexual offense prosecution during the prosecutor's closing argument allegedly commenting on defendant's exercise of his right not to testify or produce evidence, because: (1) the prosecutor was addressing defendant's failure to refute the State's theory of the case while acknowledging that some questions remained unanswered; (2) there is no error in an argument that the State's evidence was uncontradicted, and a prosecutor's argument pointing out a defendant's failure to answer the State's evidence is not a comment on defendant's failure to testify; and (3) it is assumed that the jurors followed the court's admonition to disregard any comments relating to a polygraph and that the stricken testimony played no part in the jurors' evaluation of the

portions of the prosecutor's argument relating to defendant's failure to rebut the State's evidence.

## 11. Criminal Law— prosecutor's argument—vouching for witnesses

The trial court did not err by failing to intervene ex mero motu in a first-degree murder, first-degree burglary, and first-degree sexual offense prosecution during the prosecutor's closing argument where the prosecutor allegedly vouched for his own witnesses by stating the State's witnesses had no axe to grind and came to tell the truth, because: (1) counsel is allowed to give the jurors reasons why they should believe the State's evidence; and (2) the prosecutor did not personally vouch for the witnesses or place the State's imprimatur on their testimony, but only argued that logic compelled the conclusion that the witnesses were credible.

## 12. Criminal Law— prosecutor's argument—community revulsion

The trial court did not err by failing to intervene ex mero motu in a first-degree murder, first-degree burglary, and first-degree sexual offense prosecution during the prosecutor's closing argument allegedly asking the jury to convict on the basis of community revulsion to the crime, because: (1) the prosecutor did not argue that the jury should be swayed by local sentiment, but instead pointed out that the jurors had the responsibility of deciding the case; (2) arguments characterizing the jury as the conscience of the community have been upheld; and (3) the prosecutor in fact instructed the jurors not to be swayed by community sentiment.

## 13. Sentencing— capital—prosecutor's argument—expert's untruthful testimony in exchange for pay

The trial court did not err by failing to intervene during the prosecutor's closing argument in the capital sentencing phase stating that defendant's expert should not be believed based on the fact that he would give untruthful or inaccurate testimony in exchange for pay. While an argument imputing perjury to a witness on the basis of evidence no more substantial than the mere fact the witness was compensated is improper, it was not so grossly improper as to require the trial court to intervene ex mero motu.

**14. Sentencing— capital—psychiatric expert—prosecutor's cross-examination and argument—cumulative effect**

Defendant is entitled to a new capital sentencing proceeding because of the cumulative effect of improprieties in the prosecutor's cross-examination of defendant's psychiatric expert and the prosecutor's closing argument pertaining to the expert where the prosecutor went beyond ascribing the basest of motives to defendant's expert that the expert would perjure himself for pay, but he also indulged in *ad hominem* attacks, disparaged the witness's area of expertise, and distorted the expert's testimony.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Haigwood, J., on 14 April 2000 in Superior Court, Halifax County, upon a jury verdict finding defendant guilty of first-degree murder. On 21 June 2001, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 13 February 2002.

*Roy Cooper, Attorney General, by Valérie B. Spalding, Special Deputy Attorney General, for the State.*

*Staples Hughes, Appellate Defender, and Janet Moore, Assistant Appellate Defender, for defendant-appellant.*

EDMUNDS, Justice.

On 25 August 1997, defendant Lionel Lewis Rogers was indicted for first-degree murder, first-degree burglary, and first-degree sexual offense. He was tried capitally before a jury at the 20 March 2000 session of Superior Court, Halifax County. On 10 April 2000, the jury found defendant guilty of all charges. The first-degree murder conviction was based on theories both of premeditation and deliberation and of felony murder. At defendant's capital sentencing proceeding, the jury found the existence of five aggravating circumstances, two statutory mitigating circumstances, and fourteen nonstatutory mitigating circumstances, and recommended the death penalty. On 14 April 2000, the trial court sentenced defendant to death for the first-degree murder conviction. The trial court also imposed consecutive sentences of 146 to 185 months' imprisonment for the first-degree burglary conviction and 480 to 585 months' imprisonment for the first-degree sexual offense conviction. Defendant appeals his conviction for first-degree murder and his sentence of death to this Court as

a matter of right. On 21 June 2001, we allowed defendant's motion to bypass the Court of Appeals as to his burglary and sexual offense convictions. For the reasons that follow, we conclude that defendant's trial was free from prejudicial error; however, we hold that defendant is entitled to a new capital sentencing proceeding.

At trial, the State presented evidence that Hazel Sechler, the eighty-eight-year-old victim in this case, lived alone in Weldon, North Carolina. At approximately 9:25 p.m. on 11 May 1997, her neighbor Irma Johnson telephoned the victim. During their conversation, the line went dead. When Johnson's attempts to call the victim back were unsuccessful, she took a flashlight onto her porch and looked toward the victim's house, which was about forty feet away. The lights in the victim's home provided adequate illumination, and Johnson saw a man on the victim's porch. She noticed the man's appearance, complexion, hair style, and clothing. When she saw the man enter the victim's home, she called the police.

As Johnson continued to watch, she saw the man emerge from the victim's house carrying in his left hand an implement that appeared to be a knife. She called the police again, and shortly thereafter, Lieutenant Eugene Harris of the Weldon Police Department responded. He met Johnson, then observed that the telephone wires leading to the victim's house appeared to have been cut. Upon entering the victim's home, he noticed that a door leading upstairs had been forced open, then saw a cane and a shoe in the hall and what appeared to be a spot of blood on the wall.

Lieutenant Harris found the victim lying on her bed, bleeding from injuries to her throat and hands. Her neck had been sliced so deeply that she was breathing through the wound in her trachea. Her nightgown had been ripped away from her chest and abdomen. Her panties were around her ankles, and the responding paramedics observed blood around her vaginal area. The victim was conscious but unable to speak because her larynx had been cut.

The victim was transported to a local hospital, then immediately airlifted to Duke University Medical Center. While receiving treatment the next day, the victim suffered a fatal heart attack. John Butts, chief medical examiner for the State of North Carolina, was accepted by the court as an expert in the field of forensic pathology. He conducted the autopsy of the victim and described the injuries to her neck. He stated that she had a "large gaping wound" in her throat and "two deeper cutting injuries" in the same area, "indicating that it

[took] more than one stroke or movement to produce the cut." He also found defensive wounds on both of the victim's hands and evidence of injury to the victim's genitalia. Dr. Butts' opinion was that the victim's death was caused by the injuries to her neck.

After the victim was taken to the hospital on 11 May 1997, police interviewed Johnson. She described the individual she saw as a black male with dreadlocks who was wearing a blue-green T-shirt. On 12 May 1997, police found a T-shirt matching Johnson's description 131 feet from defendant's home. Individuals who saw defendant at different times on 11 May 1997 identified the T-shirt as being the one he had been wearing that day. Also on 12 May 1997, police observed defendant walk slowly past the victim's home, then later twice drive past it.

Defendant voluntarily went to the police station on 13 May 1997, where he provided blood, hair, and clothing samples. He also was photographed, and that same day, police showed Johnson a photographic lineup. She promptly identified defendant as the individual she had seen enter the victim's home and also identified the T-shirt found by the police as matching the shirt worn by the intruder.

Subsequent testing of the DNA in two hairs found on the T-shirt excluded defendant as the source of the hairs, but the victim was in 8.5% of the Caucasian population that could have contributed the strands. DNA testing of the blood found on the shirt revealed that there was only one chance in many millions that the blood did not come from the victim. Additional DNA testing of fabric around the T-shirt's collar indicated that while there had been more than one wearer, the profile of the major contributor nevertheless could be determined. That profile matched the DNA obtained from defendant's blood sample. The odds against an unrelated individual also matching the major contributor's genetic profile were one in 4,800 for the African-American population, one in 230,000 for the Caucasian population, one in 130,000 for the southeastern Hispanic population, and one in 68,000 for the southwestern Hispanic population.

One of defendant's neighbors testified that after the assault on the victim, she visited defendant at his home and saw him carrying a bag containing a knife that appeared to be bloody. As she watched, defendant cleaned the knife. Defendant told her he had dropped it in some blood on the way home and to keep the knife a secret.

**STATE v. ROGERS**

[355 N.C. 420 (2002)]

On 6 August 1997, defendant was arrested. He was transported to the police station and given *Miranda* warnings. Defendant appeared unconcerned and told investigators that they had nothing on him. However, when investigators showed defendant a photograph of the victim and advised him that she could not have identified him because she had been legally blind, defendant grew quiet and remarked, "She didn't have to die." The next day, police searched a mini-storage bin rented by defendant and recovered several knives of a style similar to those found in defendant's home.

Defendant presented no evidence during the guilt-innocence phase of his trial.

## PRETRIAL ISSUES

**[1]** First, defendant contends that the trial court erred in denying his motion to change venue. In this motion, originally filed on 15 September 1997, defendant cited several newspaper articles about the murder. When this motion was heard on 19 April 1999, defendant submitted to the court seven articles from the local newspaper. The court reviewed these articles and observed that some of them described the events of the crime and the nature of the victim without naming defendant. Defendant responded by pointing out that other articles focused on defendant and argued that even where he was not mentioned, the articles had a natural tendency to inflame the readers. After considering defendant's arguments, the trial court noted that the most recent article was more than a year and a half old and that additional time would pass before the case would be called for trial. Because of this extended interval, the court concluded

> that there's no reasonable likelihood that members of the public would be able to recall in any specific detail the reports of the media concerning this event or of the defendant, nor is it likely that they would have preconceived impressions that they would continue to have about this matter based upon such pretrial publicity.
>
> . . . The defendant has failed to show that there's a reasonable likelihood that prejudicial pretrial publicity will prevent a fair trial in this case.

Accordingly, the court denied defendant's motion without prejudice to defendant to raise the issue again at the time of trial.

When the case was called for trial on 20 March 2000, defendant renewed his motion, citing a recently broadcast television report. The court viewed the segment, considered arguments of counsel, and denied defendant's motion; however, the court allowed defendant to address pretrial publicity during jury *voir dire*. Of the sixty-nine prospective jurors considered for service, forty-one had some knowledge of the case, and of the fifteen jurors actually selected, nine had such knowledge.

A motion to change venue is controlled by N.C.G.S. § 15A-957, and a trial court's denial of such a motion will not be reversed absent an abuse of discretion. *State v. Golphin*, 352 N.C. 364, 391-92, 533 S.E.2d 168, 190 (2000), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305 (2001). Similarly, a motion for individualized jury selection is also addressed to the trial court's discretion. *State v. Anderson*, 355 N.C. 136, 147, 558 S.E.2d 87, 95 (2002). Our review of the record and the particular incidents cited by defendant satisfy us that the trial court did not abuse its discretion here. To obtain a change of venue, a defendant must show a specific and identifiable prejudice against him as a result of pretrial publicity. *State v. Barnes*, 345 N.C. 184, 204, 481 S.E.2d 44, 54, *cert. denied*, 522 U.S. 876, 139 L. Ed. 2d 134 (1997), *and cert. denied*, 523 U.S. 1024, 140 L. Ed. 2d 473 (1998). Defendant's general allegations that the attention devoted by local media to this case tainted the jury pool fail to establish the particularized prejudice necessary to support a change of venue. Accordingly, the trial court did not abuse its discretion by denying defendant's motion for change of venue.

[2] Defendant also moved for individual selection of jurors. The court denied his motion, holding that, in its discretion, it would follow the procedures set out in the statutes. *See* N.C.G.S. ch. 15A, art. 72 (2001) (entitled "Selecting and Impaneling the Jury"). Defendant now argues that several prospective jurors tainted the pool by expressing improper opinions as to defendant's guilt or the outcome of the trial while other prospective jurors were listening. Defendant further contends that he was compelled to expend peremptory challenges to remove several prospective jurors who were prejudiced against him. However, our review of the record reveals that the trial court maintained control over the jury selection process, intervening to ask questions as necessary and clarifying matters to the prospective jurors as appropriate. The trial court interrupted on at least one occasion when a prospective juror appeared to be on the verge of making an improper comment and allowed challenges for cause as to

jurors who were unable to follow the law. The court also instructed the prospective jurors to disregard improper comments. The trial court's actions, consistent with the statutory scheme, ensured that *voir dire* was conducted properly.

Defendant specifically claims that he was compelled to accept one objectionable juror after he had expended all his peremptory challenges. This juror, who was initially called as an alternate, first stated that she was familiar with the case and, while she had no opinion as to whether defendant was guilty or innocent, would favor the death penalty if defendant were convicted. The court then took over the questioning of this juror, and following some inquiries and explanations of the law from the bench, the juror stated that she now understood the sentencing process and affirmed that she could set aside her personal beliefs and follow the law. This juror was accepted as an alternate and later became a regular juror during the trial.

Defendant asks us to revisit our doctrine that holds that even after a prospective juror initially voices sentiments that would normally make him or her vulnerable to a challenge for cause, that prospective juror may nevertheless serve if the prospective juror later confirms that he or she will put aside prior knowledge and impressions, consider the evidence presented with an open mind, and follow the law applicable to the case. *See, e.g.*, *State v. Wallace*, 351 N.C. 481, 521, 528 S.E.2d 326, 351, *cert. denied*, 531 U.S. 1018, 148 L. Ed. 2d 498 (2000). It appears to be defendant's position that such a juror cannot be rehabilitated and that allowing such a juror to serve constitutes structural error. We disagree. A judge who observes the prospective juror's demeanor as he or she responds to questions and efforts at rehabilitation is best able to determine whether the juror should be excused for cause. In the case at bar, we discern no abuse of discretion in the trial court's decision not to allow a challenge for cause of this prospective juror. Similarly, we see no abuse of discretion in the trial court's denial of defendant's motion for individualized jury selection.

These assignments of error are overruled.

[3] Next, defendant argues that the trial court erred in denying his motions to suppress Johnson's identification of him in a photographic lineup. Defendant filed two such motions to suppress. In the first, filed 12 April 1999, defendant claimed that he was impermissibly photographed on 13 May 1997 because he was then in custody at the Weldon Police Department. Defendant also contended in this motion

that the identification procedure was "highly suggestive and prejudicial." In his second motion to suppress, filed 23 August 1999, defendant made a more detailed argument that the identification procedure was suggestive.

The trial court conducted a hearing on 13 September 1999 at which Johnson and Chief Karl Clark of the Weldon Police Department testified. The prosecution presented evidence through Chief Clark that defendant came to the police station voluntarily and was not under arrest or in custody when photographed. As to the photographic identification procedure, Chief Clark testified that on 13 May 1997, officers showed Johnson an array of six photographs, including the photograph taken of defendant that day, and that she quickly selected defendant's photograph. The array was admitted into evidence.

Johnson testified that she was satisfied that the individual she identified in the photographic lineup was the man she saw at the victim's home the night of the murder. She added that some time after making this identification, she saw two photographs of defendant in a newspaper when he was arrested. When asked if the man she saw at the victim's home was then in courtroom, she identified defendant.

After the prosecution completed its presentation of evidence, defendant argued that the array was defective for two reasons: (1) defendant's photograph was the only one that did not have a background of horizontal lines, suggesting that his was the only photograph that was not a mug shot; and (2) those in the array were all "distinctively different" in coloration, hairstyle, and so forth. The court viewed the array, considered additional arguments of counsel, then orally denied defendant's motions.

The court entered its written order on 23 September 1999. In addition to reciting the evidence, the court noted that it had examined the array and found as a fact

that the photographs of the persons depicted therein are of the same type and contain similarities and consistencies of appearance, and said photographic lineup was not so unnecessarily suggestive or conducive so as to lead to any chance of mistaken identification to the extent that the Defendant would be denied due process of law.

Based on its findings of fact, the court concluded as a matter of law that defendant's photograph was legally obtained, that the photo-

graphic lineup was not so unnecessarily suggestive as to lead to a chance of mistaken identification to the extent that defendant would be denied due process of law, and that Johnson's identification of defendant in court was of independent origin and based on what she had seen at the time of the offense. Accordingly, the trial court denied defendant's motions to suppress. Defendant has not appealed the court's finding that he was not in custody when photographed. However, defendant vigorously contends that the identification procedures followed here were improper.

Whether an identification procedure is unduly suggestive depends on the totality of the circumstances. *State v. Pigott*, 320 N.C. 96, 99, 357 S.E.2d 631, 633 (1987). A due process analysis requires a two-part inquiry. *State v. Fowler*, 353 N.C. 599, 617, 548 S.E.2d 684, 698 (2001), *cert. denied*, —— U.S. ——, 152 L. Ed. 2d 230 (2002). "First, the Court must determine whether the identification procedures were impermissibly suggestive." *Id.* If so, "the Court must then determine whether the [suggestive] procedures created a substantial likelihood of irreparable misidentification." *Id.* In determining whether identification procedures are impermissibly suggestive, courts have considered such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty shown by the witness, and the time between the offense and the identification. *Manson v. Brathwaite*, 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154 (1977). Where a witness identifies a defendant in a photographic lineup, this Court has considered pertinent aspects of the array, such as similarity of appearance of those in the array and any attribute of the array tending to focus the witness' attention on any particular person therein, as factors in determining whether the identification procedures are impermissibly suggestive. *See, e.g., State v. Freeman*, 313 N.C. 539, 545, 330 S.E.2d 465, 471 (1985) (affirming that photographic lineup was lawful despite the defendant's contention that he .was the heaviest individual in the array and also affirming the trial court's denial of the defendant's motion to suppress the in-court identification testimony of three witnesses who had also identified the defendant in the photographic lineup); *State v. Gaines*, 283 N.C. 33, 40, 194 S.E.2d 839, 844 (1973) (affirming that photographic lineup was lawful despite the defendant's contention that he was the youngest and lightest man in the array); *State v. Roberts*, 135 N.C. App. 690, 694, 522 S.E.2d 130, 132-33 (1999) (affirming that photographic lineup was lawful despite

the defendant's contention that he was the only one with freckles in the array), *disc. rev. denied*, 351 N.C. 367, 543 S.E.2d 142 (2000). In addition, we have held that "[a] photographic lineup is not impermissibly suggestive merely because defendant has a distinctive appearance." *State v. Freeman*, 313 N.C. at 545, 330 S.E.2d at 471. Indeed, "[i]f such were the rule, no lineup would be valid because no two men are alike." *State v. Gaines*, 283 N.C. at 40, 194 S.E.2d at 844. "The trial court's findings of fact are binding on appeal when supported by competent evidence." *State v. Fowler*, 353 N.C. at 618, 548 S.E.2d at 698.

On appeal, defendant has refined his argument that the photographic array is improper by adding that the color of his shirt matches the outline of tape that frames and holds together the array, therefore drawing a viewer's eye to defendant. This Court has viewed the array. It depicts six African-American males of similar complexion and age. Only the top of the shoulders show in the photographs, so that clothing is not particularly significant; nevertheless, we note that two men are wearing gold or orange, one is wearing gray, one is wearing green, one is wearing white, and defendant is wearing red. All are bearded. Four of the men have dreadlocks or otherwise braided hair, one has short hair, and one has an Afro. The red tape that borders the array is closer to two others than to defendant. Although defendant is the only one in the array not standing before a grid of horizontal lines, all the photographs have a light background. None of the men appears particularly distinctive in comparison with any of the others. Accordingly, we agree with the trial court that the photographic array was not improperly suggestive, and therefore we need not consider whether the procedure created a substantial likelihood of irreparable misidentification. *Id.* at 619, 548 S.E.2d at 698.

[4] Defendant also challenges Johnson's in-court identification.

[T]he viewing of a defendant in the courtroom during the various stages of a criminal proceeding by witnesses who are offered to testify as to identification of the defendant is not, of itself, such a confrontation as will taint an in-court identification unless other circumstances are shown which are so "unnecessarily suggestive and conducive to irreparable mistaken identification" as would deprive defendant of his due process rights.

*State v. Covington*, 290 N.C. 313, 324, 226 S.E.2d 629, 638 (1976) (quoting *Stovall v. Denno*, 388 U.S. 293, 302, 18 L. Ed. 2d 1199, 1206

(1967)). The record reveals that Johnson had the opportunity to view the perpetrator from a distance of approximately forty feet for several seconds on two occasions. Although it was night, lighting was adequate to allow her to see the man's face. Her eyesight is good. She was paying close attention and shortly thereafter provided a detailed description to the investigators. At the suppression hearing, she was careful to ask to see defendant without his hat before committing herself, then was confident of her identification.

We hold that her in-court identification was made independently of the photographic identification procedure and was properly admitted. This assignment of error is overruled.

## JURY SELECTION

[5] Defendant raises three issues pertaining to jury selection. First, defendant argues that the trial court improperly excused two prospective jurors for cause without conducting adequate *voir dire*. This Court recently discussed the law applicable to challenges for cause in *State v. Reed*, 355 N.C. 150, 155-56, 558 S.E.2d 167, 171-72 (2002). Grounds for allowing a challenge for cause include that the juror "[a]s a matter of conscience, regardless of the facts and circumstances, would be unable to render a verdict with respect to the charge in accordance with the law of North Carolina," N.C.G.S. § 15A-1212(8), or "[f]or any other cause is unable to render a fair and impartial verdict," N.C.G.S. § 15A-1212(9). Moreover, "[t]he judge may excuse a juror without challenge by any party if he determines that grounds for challenge for cause are present." N.C.G.S. § 15A-1211(d). To determine whether a prospective juror is capable of rendering a fair and impartial verdict, the trial court must " 'reasonably conclude from the *voir dire* examination that a prospective juror can disregard prior knowledge and impressions, follow the trial court's instructions on the law, and render an impartial, independent decision based on the evidence.' " *State v. Jaynes*, 342 N.C. 249, 270, 464 S.E.2d 448, 461 (1995) (quoting *State v. Green*, 336 N.C. 142, 167, 443 S.E.2d 14, 28, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994)), *cert. denied*, 518 U.S. 1024, 135 L. Ed. 2d 1080 (1996).

A trial court's excusal of a prospective juror for cause is reviewed for abuse of discretion. *State v. Smith*, 352 N.C. 531, 543, 532 S.E.2d 773, 782 (2000), *cert. denied*, 532 U.S. 949, 149 L. Ed. 2d 360 (2001). Such abuse of discretion occurs where the trial court's determination is " 'manifestly unsupported by reason' " and " 'so arbitrary that it could not have been the result of a reasoned decision.' " *State v.*

*T.D.R.*, 347 N.C. 489, 503, 495 S.E.2d 700, 708 (1998) (quoting *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985)). An appellate court will affirm a trial court's discretionary ruling if the trial court's findings are fairly supported by the record. *Wainwright v. Witt*, 469 U.S. 412, 434, 83 L. Ed. 2d 841, 858 (1985).

The attorneys and the court conducted the following pertinent *voir dire* of Lucy Williams, the first prospective juror who defendant claims was improperly challenged for cause:

THE COURT: Do you know the defendant in this matter, Lionel Lewis Rogers?

MS. WILLIAMS: Yes, I do.

THE COURT: Okay. Do you know members of his family?

MS. WILLIAMS: I knew his mother for years, his adopted mother, I [knew] her for years.

THE COURT: All right. Have you visited in their home or they visited in your home?

MS. WILLIAMS: She has.

THE COURT: Do you know the defendant through his mother?

MS. WILLIAMS: Through his mother.

THE COURT: That's how you know him?

MS. WILLIAMS: Yes. Yes.

THE COURT: Would you consider—is he a casual acquaintance or is he someone that you . . .

MS. WILLIAMS: (Interjected) I would just say casual because I didn't see him that much, but I have talked with him a couple of hours at the store and, you know, things like that.

THE COURT: You know his mother much better.

MS. WILLIAMS: Yes.

THE COURT: She's more than a casual acquaintance?

MS. WILLIAMS: Yes, she is.

THE COURT: The fact that you know him in the manner that you described and know his mother in the way you have told us, would that prevent you—would that be something that you

would carry into this case and would prevent you from being able to be impartial?

Ms. WILLIAMS: I don't know. I really couldn't say because like I said, she's a very good friend, she's a very good friend of my mother's and I've known her for years.

THE COURT: Okay. And only you would know, but what I'm asking you is, the fact that you know her in the way that you've described, do you believe that would be something that you would take—if you were selected as a juror, that would be something that you would take with you into the jury room and would affect how you would decide issues . . .

Ms. WILLIAMS: (Interjected) It might.

THE COURT: . . . of guilt or innocence?

Ms. WILLIAMS: I think so because I just care a lot about her.

THE COURT: Care a lot about her?

Ms. WILLIAMS: About his mother; yes.

THE COURT: Would you be able to set that aside?

Ms. WILLIAMS: I really couldn't say.

THE COURT: I mean there's no right or wrong answers, I want you to understand that, nobody is trying to . . .

Ms. WILLIAMS: (Interjected) Yeah, I understand what you're saying and I'm trying to understand it myself. I wouldn't want, I wouldn't know if it would [—] you understand what I'm saying? I wouldn't know if it would come up because I've never been through this before.

THE COURT: Yes, ma'am. Well, because we don't—I would say to you as I would to the other members of the jury panel, this case, both the State and the defendant are entitled to a trial and a jury's decision . . .

Ms. WILLIAMS: (Interjected) I know.

THE COURT: . . . based upon the evidence that comes out here in the courtroom . . .

Ms. WILLIAMS: (Interjected) Yeah, what happened.

**STATE v. ROGERS**

[355 N.C. 420 (2002)]

THE COURT: . . . in accordance with the law and not based upon personal acquaintances . . .

MS. WILLIAMS: (Interjected) I know, I know.

THE COURT: . . . in the community or maybe even what people are saying in the community but based upon what happens here, the evidence and the law.

MS. WILLIAMS: (Interjected) Yeah, what's right and what's wrong.

THE COURT: And would you be able—what I'm asking you is whether you would be able if you were selected as a juror to base your verdict upon the evidence and the law that comes out during the trial or whether you feel like that your personal acquaintance with the defendant and his family, or his mother, would— that would be something that you would not be able to set aside[,] that it would play a part in your verdict?

MS. WILLIAMS: I think it would hinder it.

THE COURT: Okay. You believe it would cause you a problem?

MS. WILLIAMS: I think it would.

THE COURT: Cause you a problem?

MS. WILLIAMS: Yes, it would.

THE COURT: And you would—and your verdict, if you were to arrive at a verdict in this case it would be effected [sic] by . . .

MS. WILLIAMS: (Interjected) The way I feel about her.

THE COURT: . . . not wanting to—about how you care for his mother?

MS. WILLIAMS: That's right.

THE COURT: All right. And then that would—if the evidence, well, let me move right on then, if the evidence and the law in this case satisfied you beyond a reasonable doubt that the defendant was guilty of murder in the first degree or first degree burglary or first degree sex offense or any lesser included offenses, would you be able to return such a verdict or would your personal acquaintance and friendship with his mother prevent you or impair you from being able to do that?

STATE v. ROGERS

[355 N.C. 420 (2002)]

Ms. WILLIAMS:  I would have to do the right thing now. I would have to do that. If this happened I would have to do the right thing.

THE COURT:  Okay.

Ms. WILLIAMS:  I know what bothers me with his mother, I know that's true, but I mean right is right.

THE COURT:  So you would, even though it would cause you— would concern you . . .

Ms. WILLIAMS:  (Interjected) Yes, it would be very much concerning me.

THE COURT:  . . . you would be able then to set it aside?

Ms. WILLIAMS:  Uh huh . . .

THE COURT:  Now, ma'am, you need to listen to me.

Ms. WILLIAMS:  I know what you're saying and . . .

THE COURT:  I just want to be sure I understand what you're saying.

Ms. WILLIAMS:  [Y]eah.

THE COURT:  If you can't set it aside just, you know . . .

Ms. WILLIAMS:  (Interjected) I don't think so.

THE COURT:  You could not set it aside?

Ms. WILLIAMS:  No, I don't think so. I really don't.

THE COURT:  So it would prevent you from being able to return a verdict . . .

Ms. WILLIAMS:  (Interjected) Yes, I think so.

THE COURT:  . . . of guilty . . .

Ms. WILLIAMS:  (Interjected) Uh huh, it would.

THE COURT:  . . . because of your friendship with his mother?

Ms. WILLIAMS:  Uh huh.

THE COURT:  And now you're sure of that, ma'am?

Ms. WILLIAMS:  I'm sure, yes.

STATE v. ROGERS

[355 N.C. 420 (2002)]

THE COURT: I'm not putting words in your mouth.

MS. WILLIAMS: I know you're not. No, I'm sure of it.

THE COURT: Do I clearly understand what you're saying now?

MS. WILLIAMS: Yes, uh huh, yes.

THE COURT: The State have a motion?

[PROSECUTOR]: For cause, Your Honor.

THE COURT: State's challenge for cause is allowed.

[DEFENSE COUNSEL]: We would object.

THE COURT: Defendant's objection to the Court allowing the State's challenge for cause is overruled and denied.

[DEFENSE COUNSEL]: Request an opportunity to rehabilitate.

THE COURT: Your request to get her to seek to change her mind is denied.

Defendant argues that whenever this prospective juror gave responses indicating a willingness to consider the evidence with an open mind, the court steered her toward answers that would make her open to a challenge for cause. However, the record, as quoted above, demonstrates that the judge learned that the juror knew defendant personally, was a friend of defendant's mother, and had misgivings about serving on the jury. Alerted by these potential sources of conflict, the court did not direct the prospective juror's answers in any direction. Instead, the court cautioned the prospective juror to listen to his questions, apparently in response to her tendency to interrupt. This record leaves no doubt that the experienced trial judge was " 'left with the definite impression that [this] prospective juror would be unable to faithfully and impartially apply the law.' " *State v. Smith*, 352 N.C. at 543, 532 S.E.2d at 782 (quoting *Wainwright v. Witt*, 469 U.S. at 426, 83 L. Ed. 2d at 852). Moreover,

[w]hen challenges for cause are supported by prospective jurors' answers to questions propounded by the prosecutor and by the court, the court does not abuse its discretion, at least in the absence of a showing that further questioning by defendant would likely have produced different answers, by refusing to allow the defendant to question the juror challenged.

*State v. Oliver*, 302 N.C. 28, 40, 274 S.E.2d 183, 191 (1981). Here, the prospective juror had unambiguously, and without prodding by the court, stated that she would be unable to return a verdict of guilty. The court did not abuse its discretion in denying defendant's motion to rehabilitate this prospective juror.

As to Robert Hudson, the second prospective juror who defendant contends was improperly dismissed, the following pertinent *voir dire* took place:

[PROSECUTOR]: You understand that anybody who sits on this jury must be able upon hearing the evidence and the law must be able upon finding this defendant guilty of first degree murder, they must be able to recommend the death penalty, they must be able to recommend life imprisonment without parole. You understand?

MR. HUDSON: (Nods his head.)

[PROSECUTOR]: Are you saying that that's something that you . . .

MR. HUDSON: (Interjected) I can probably recommend him life in prison [sic].

[PROSECUTOR]: But insofar as recommending the death penalty, you feel that's something you just couldn't do?

MR. HUDSON: Right now in this point in my life I can't say death penalty because of stuff that's been going on with my life so I can't say.

[PROSECUTOR]: Is that coming from a religious conviction that you have or a personal conviction that you have, or moral conviction that you have?

MR. HUDSON: It's both, personal and religious.

[PROSECUTOR]: Okay. Is this a conviction that you've had for some time or, and if so, can you tell us how long it's been?

MR. HUDSON: Over about three years and then when I started school they motivated us like during different times of the class and stuff and they changed like my thoughts and my thinking and so I can't say.

[PROSECUTOR]: But would it be fair and honest to say that as a matter of conscience that regardless of what the facts are in

this case or any other case that recommending the death penalty is just something you couldn't do?

. . . .

MR. HUDSON: I think it's something that I could do but I got [sic] to hear the evidence and get down into it before I can say if I can say that he should be put to death or if he was found guilty he should be put to death, so I can't say. I can't say. I can't say.

[PROSECUTOR]: So as you sit there right now this morning would it be fair and honest to say that upon hearing the evidence and the law that you could say right now that you could vote that he receive life imprisonment without parole, could you do that?

. . . .

MR. HUDSON: That by hearing the evidence that if found guilty I recommended life in prison?

[PROSECUTOR]: Yes.

MR. HUDSON: Depends on if he can get like some type of psychology and you know check out his head and brain and all that I might—I don't know.

. . . .

THE COURT: Let me ask you sir, first, based on your religious and personal views can you conceive of some set of facts or circumstances in your mind, not asking you what they are, but just asking if you can conceive of some set of facts and circumstances in your mind where you if you were selected as a juror could vote to recommend a sentence of death?

MR. HUDSON: No.

THE COURT: You cannot?

MR. HUDSON: (Shakes his head.)

THE COURT: Then if you were selected as a juror in this case—well, let me first ask you one further question, is that—and is that because of—the reason you can't conceive of any set of facts or circumstances is that because of your religious and moral and personal beliefs?

MR. HUDSON: About the death penalty?

**STATE v. ROGERS**

[355 N.C. 420 (2002)]

THE COURT: Yes, sir.

MR. HUDSON: Yes, sir, but . . .

THE COURT: (Interjected) All right, now, if you were selected as a juror in this case and the jury that you were a part of had found the defendant guilty of first degree murder, and you had heard evidence as it relates to aggravating and mitigating circumstances and at that point you were satisfied from the evidence and beyond a reasonable doubt of the existence of one or more aggravating circumstances; secondly, you were satisfied that if there were mitigating circumstances that they were insufficient to outweigh the aggravating circumstances beyond a reasonable doubt; and third, you were satisfied from the evidence and beyond a reasonable doubt that one or more of those aggravating circumstances was sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstances, would you be able or unable to recommend a sentence of death?

MR. HUDSON: Not able.

THE COURT: You would not be able?

MR. HUDSON: Unable.

THE COURT: And that would be no matter what the facts are, no matter what the circumstances might reveal? Is that correct or not?

MR. HUDSON: That's correct.

THE COURT: Any question in your mind about that sir?

MR. HUDSON: (Shakes his head.)

THE COURT: Anything I can explain to you any further to help you understand the process by which a jury would go about reaching that decision?

MR. HUDSON: No, sir.

THE COURT: You're satisfied with your answers?

MR. HUDSON: (Nods his head.)

THE COURT: You would then always recommend a sentence of life imprisonment without parole, correct?

STATE v. ROGERS

[355 N.C. 420 (2002)]

MR. HUDSON: Yes, yes, sir.

THE COURT: And never recommend a sentence of death, correct?

MR. HUDSON: Yes, yes, sir, it's hard to say, it's really hard to say, hard to say.

THE COURT: Wait a minute now, tell me—a minute ago I thought you had said you would always recommend a sentence of life imprisonment.

MR. HUDSON: See, I'm like the lady that just left, I mean it's still—that's two deaths, you know, that's like religious, the Bible says "Thou shalt not kill," that [H]e'll take care of your enemies or whatever.

THE COURT: Yes, sir. So that would prevent you then from being able to recommend a sentence of death?

MR. HUDSON: Yes, sir. If you would have called me three years back maybe.

THE COURT: Three years ago you might have been able . . .

MR. HUDSON: (Interjected) I might have, yeah, I might have.

THE COURT: But now you can't?

MR. HUDSON: I can't since I been [sic] reading the Bible and stuff, you know.

THE COURT: Thank you. [Mr. Prosecutor], do you have a motion?

[PROSECUTOR]: For cause, Your Honor.

THE COURT: The State's challenge for cause is allowed.

[DEFENSE COUNSEL]: Defendant would object.

[DEFENSE COUNSEL]: Defendant objects; request an opportunity to rehabilitate.

THE COURT: Thank you. That request is denied. State's challenge for cause is allowed. Court denies the request to rehabilitate in the Court's discretion. And in exercise of my discretion I'm satisfied based on the juror's answers that his position is an unequivocal position, one based upon strong religious and personal views that he's held for over three years and, therefore, this

juror is excused for reasons as a matter of conscience, regardless of the facts or circumstances he would be unable to render a verdict with respect to the charge in accordance with the laws of North Carolina.

This record reveals that the trial court made searching and impartial inquiry of the prospective juror, whose answers revealed his inability to serve on a capital jury. The trial court correctly allowed the prosecutor's motion to challenge the juror for cause and did not abuse its discretion in denying defendant's motion to attempt to rehabilitate the juror.

These assignments of error are overruled.

[6] Defendant next argues that the trial court erred in overruling his objections to the prosecutor's peremptory challenges of several jurors. Defendant contends that these strikes were racially discriminatory and a violation of his rights under the United States and North Carolina Constitutions, as set out in *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986).

Defendant is African-American, and the victim was Caucasian. The race of a defendant and of a victim may be a relevant factor in determining whether a defendant has raised an inference of purposeful discrimination. *State v. Locklear*, 349 N.C. 118, 140, 505 S.E.2d 277, 290 (1998), *cert. denied*, 526 U.S. 1075, 143 L. Ed. 2d 559 (1999). During jury selection, the prosecution exercised two peremptory strikes against African-American prospective jurors. Defendant raised a *Batson* objection. Finding that defendant had failed to make a *prima facie* showing of discrimination, the court overruled the objection. The prosecutor then peremptorily struck two more African-American prospective jurors, and defendant renewed his *Batson* challenge. In again overruling defendant's objection, the trial court noted that during the first selection round the prosecution had passed six African-American jurors and six Caucasian jurors, and during the second selection round had passed two African-Americans and six Caucasians.

However, when the prosecutor peremptorily struck a fifth African-American prospective juror, the court required the prosecutor to set his reasons on the record. The prosecutor complied, giving his explanation for challenging both Caucasian and African-American prospective jurors. One prospective juror knew defendant's mother and was ambivalent about sitting in judgment, another's spouse had

worked for one of defendant's counsel, another had a history of problems with the law and may have been mentally challenged, another seemed uncomfortable with the law and unwilling to participate in the trial, another had a prior DWI and seemed to the prosecutor to be "weak" on the death penalty, and another also appeared to be mentally challenged and had a family history of encounters with the law. When the prosecutor completed his recitation, defendant declined the court's offer to present rebuttal evidence. The court then noted that it had been observing the selection process from the beginning and accepted the prosecution's proffered reasons for his peremptory challenges as race-neutral.

The trial court thus followed the three-step inquiry set out in *Batson*. When the court determined that defendant had established a *prima facie* case of discrimination, it required the prosecution to offer race-neutral explanations for its peremptory challenges. After those explanations were provided, the court determined that defendant had not established purposeful racial discrimination. *See Batson v. Kentucky*, 476 U.S. at 96-97, 90 L. Ed. 2d at 87-88. The burden of persuasion was on defendant in making this motion, *see Purkett v. Elem*, 514 U.S. 765, 767, 131 L. Ed. 2d 834, 839 (1995); *State v. Locklear*, 349 N.C. at 140, 505 S.E.2d at 290, and on appeal, we give deference to the trial court's ruling, *see State v. Smith*, 328 N.C. 99, 127, 400 S.E.2d 712, 727-28 (1991) ("The ability of the trial judge to observe firsthand the reactions, hesitations, emotions, candor, and honesty of the lawyers and veniremen during voir dire questioning is crucial to the ultimate determination whether the district attorney has discriminated."). A trial court's ruling on a *Batson* challenge is reviewed for clear error. *State v. Kandies*, 342 N.C. 419, 434-35, 467 S.E.2d 67, 75, *cert. denied*, 519 U.S. 894, 136 L. Ed. 2d 167 (1996).

The jury that sat in this case consisted of ten African-Americans and two Caucasians, with two Caucasian and one Hispanic alternates.[1] Although we have held that the "excusal of even a single juror for a racially discriminatory reason is impermissible," *State v. Locklear*, 349 N.C. at 141, 505 S.E.2d at 290, we also have held that "the trial court may consider the acceptance rate of minority jurors by the State as evidence bearing on alleged discriminatory intent," *id.* at 141, 505 S.E.2d at 291. The reasons given by the prosecutor and accepted by the trial court were both race-neutral and plausible. Although defendant argues that the prosecution passed other jurors

1. One Caucasian juror who was originally seated was replaced with the Hispanic alternate while the trial was under way.

who showed the same or similar characteristics as those challenged for cause, we have rejected this mechanical type of analysis.

> [A]lleged disparate treatment of prospective jurors would not be dispositive necessarily. Choosing jurors, more art than science, involves a complex weighing of factors. Rarely will a single factor control the decision-making process. . . . "A characteristic deemed to be unfavorable in one prospective juror, and hence grounds for a peremptory challenge, may, in a second prospective juror, be outweighed by other, favorable characteristics."

*State v. Porter*, 326 N.C. 489, 501, 391 S.E.2d 144, 152-53 (1990) (quoting *People v. Mack*, 128 Ill. 2d 231, 239, 538 N.E.2d 1107, 1111 (1989), *cert. denied*, 493 U.S. 1093, 107 L. Ed. 2d 1072 (1990)).

Defendant also argues that the prosecution's contentions that it was neutral on the matter of race was belied by its later "reverse *Batson*" objection based upon defendant's exercise of peremptory strikes, allegedly made against Caucasian prospective jurors to increase the number of minorities on the jury. However, we note that the record shows that the trial judge observed defendant's pattern of peremptory strikes and gently reminded defense counsel that both sides had constitutional responsibilities during jury selection. The *Batson* motions made by trial counsel do not reveal a racially discriminatory intent on the part of either the prosecution or defendant.

Based upon the record in this case, we hold that the trial court did not commit clear error in denying defendant's *Batson* motion. These assignments of error are overruled.

[7] Finally, defendant contends that the trial court erred in excusing two prospective jurors solely on account of their age. The record reveals that the first such prospective juror, Barbara Whitehead, asked to address the court during *voir dire*:

THE COURT: Okay. Tell me what . . .

MS. WHITEHEAD: Well, on Monday I did not understand the nature of this case and I'm sixty-eight years old and I do not think I can work, you know.

THE COURT: Are you asking because of your age if you can be excused?

MS. WHITEHEAD: Yes and the fact that I could not be impartial . . .

THE COURT: (Interjected) Well I'm not able to get into that at this point but as far as your age, ma'am, if you're over sixty-five years of age the law allows me to allow you to be excused if you ask to be excused.

Ms. WHITEHEAD: I'm sixty-eight and I ask to be excused.

THE COURT: Yes, ma'am. I can excuse you for that reason.

The second prospective juror, Warren Braswell, also asked to address the court:

THE COURT: Good morning, Mr. Braswell.

MR. BRASWELL: Sir, due to my age I would like to be dismissed if possible.

THE COURT: And how old are you Mr. Braswell?

MR. BRASWELL: Sixty-nine.

THE COURT: Yes, sir. Counsel, Mr. Braswell is a member of Group C. Mr. Braswell in light of your age you're entitled to that, to be released and I will release you.

Defendant did not object to the court's excusing of either juror. He now contends that the court's action violated the applicable statutes and was unconstitutional. In the alternative, he argues that trial counsel was ineffective in not objecting to the court's action. The State responds that defendant waived the issue by failing to object and that defendant cannot raise a constitutional issue on appeal without preserving it below. Although we acknowledge the validity of the State's position, we will address defendant's arguments because similar issues related to jury selection periodically come before this Court.

By statute, citizens over the age of sixty-five are qualified to serve on juries. N.C.G.S. § 9-3 (2001). However, a prospective juror over that age may, when summoned, request an exemption. N.C.G.S. § 9-6.1 (2001). The judge has the option of allowing or denying the request. *Id.* Once the venire is in the courtroom, any juror, though qualified, nevertheless may ask to be excused. The General Assembly has

declare[d] the public policy of this State to be that jury service is the solemn obligation of all qualified citizens, and that excuses from the discharge of this responsibility should be granted only

for reasons of compelling personal hardship or because requiring service would be contrary to the public welfare, health, or safety.

N.C.G.S. § 9-6(a) (2001). This language gives trial courts considerable latitude to deal with the particular problems that appear with every trial, and we have recognized that the decision to excuse a prospective juror lies in the trial court's discretion. *State v. Neal*, 346 N.C. 608, 619, 487 S.E.2d 734, 741 (1997), *cert. denied*, 522 U.S. 1125, 140 L. Ed. 2d 131 (1998). We have stated that a juror may properly be excused on the basis of age. *State v. Nobles*, 350 N.C. 483, 494, 515 S.E.2d 885, 892 (1999) ("The transcript shows that [the prospective juror] was properly excused '[b]ecause he was over sixty-five.' "); *State v. Sanders*, 276 N.C. 598, 606, 174 S.E.2d 487, 493 (1970) ("court in its discretion properly excused the juror who was 84 years of age"), *death sentence vacated on other grounds*, 403 U.S. 948, 29 L. Ed. 2d 860 (1971). Accordingly, we discern no abuse of discretion in the trial court's decision to grant the jurors' requests to be excused. Nevertheless, in light of the statutory admonition contained in N.C.G.S. § 9-6(a), we remind the trial courts that excusing prospective jurors present in the courtroom who are over the age of sixty-five must reflect a genuine exercise of judicial discretion. Defendant correctly points out that such jurors often bring to the jury pool both a wealth of experience and a willingness to serve.

Defendant also raises two constitutional objections to the excusing of these jurors. First, he states that the statutes permitting the removal of jurors on the basis of age "violate the fair cross-section requirement of the Sixth Amendment [to the United States Constitution] by allowing the arbitrary removal of jurors on a discriminatory basis unrelated to their ability to serve." Defendant also cites Article I, Section 26 of the North Carolina Constitution. To establish his claim, however, defendant must show that there has been a systematic exclusion of a distinctive group in the community. *Lockhart v. McCree*, 476 U.S. 162, 174, 90 L. Ed. 2d 137, 149 (1986). To be "distinctive," a group must: (1) show a quality or attribute that defines or limits membership in the group; (2) possess a cohesiveness of ideas, attitudes, or experiences that distinguishes the purported group from the rest of society; and (3) share a community of interest that may not be represented in other segments of the population. *State v. Price*, 301 N.C. 437, 445-46, 272 S.E.2d 103, 109 (1980). We have held that individuals between the ages of eighteen and twenty-nine do not constitute a distinctive group because there

is no evidence that "the values and attitudes of this purported group are substantially different from those of other segments of the community" or that "the values and attitudes of the members of the purported group are cohesive and consistent." *Id.* at 446, 272 S.E.2d at 110. In the case at bar, defendant presented no evidence to support his claim that citizens over sixty-five make up a "distinctive group." For the reasons articulated in *Price*, we now hold that citizens over the age of sixty-five do not make up a "distinctive group" for the purposes of determining whether defendant was denied his right to have a jury selected from a fair cross-section of the community as guaranteed by the Sixth Amendment to the United States Constitution and pursuant to Article I, Section 26 of the North Carolina Constitution.

Defendant's second constitutional claim is that the statutes "impermissibly discriminate on the basis of age, in violation of the equal protection clauses of the Fourteenth Amendment [to the United States Constitution] and Article I, § 19 of the North Carolina Constitution." However, because age has never been determined to be a suspect class, *Phelps v. Phelps*, 337 N.C. 344, 352, 446 S.E.2d 17, 22 (1994), classifications based on age are subject to a "rational basis" review, *State v. Elam*, 302 N.C. 157, 162, 273 S.E.2d 661, 665 (1981). The rational basis of the General Assembly's decision to allow trial judges to excuse jurors on the basis of advanced age is readily apparent. The adverse effects of growing old do not strike all equally or at the same time, and it is only sensible to allow trial judges to consider the individual when a prospective juror seeks to be excused because of his or her age. Accordingly, we find no constitutional infirmity in the statutory scheme as it relates to jurors over the age of sixty-five.

[8] Finally, defendant argues that his trial counsel provided ineffective assistance by failing to object when the court excused these jurors. Because the trial court acted properly in excusing the jurors, defense counsel's acquiescence was also proper. Moreover, even if there had been any question as to the propriety of the court's actions, we see no dereliction by trial counsel. Pursuant to *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674 (1984), a defendant making a claim of ineffective assistance of counsel must establish both that "counsel's performance was so deficient as to deprive him of his right to be represented and that absent the deficient performance by defense counsel, there would have been a different result at trial." *State v. Strickland*, 346 N.C. 443, 455, 488 S.E.2d 194, 201 (1997), *cert.*

*denied,* 522 U.S. 1078, 139 L. Ed. 2d 757 (1998). However, if we can "determine at the outset that there is no reasonable probability that in the absence of counsel's alleged errors the result of the proceeding would have been different, then the court need not determine whether counsel's performance was actually deficient." *State v. Braswell,* 312 N.C. 553, 563, 324 S.E.2d 241, 249 (1985). Here, the evidence of defendant's guilt was strong. There is no evidence in the record suggesting that the two jurors who were excused would have led the other jurors to a different verdict if they had been selected to sit on this case.

Accordingly, we do not see any possibility that the outcome of the trial would have been different if defense counsel had objected to the actions of the trial court. This assignment of error is overruled.

## GUILT-INNOCENCE PHASE

[9] Defendant argues that the trial court erred in failing to conduct a hearing on a *pro se* motion that he filed during trial. This motion consisted of several handwritten letters and printed forms, collectively titled "Notice of Motion and Motion of Complaint for Investigation, Declaration; Points & Authorities." In his motion, defendant claimed that he was innocent; that he was the victim of bias; and that the prosecutor and police had presented perjured testimony, obstructed justice, and coerced and bribed witnesses, along with a host of other wrongs. Defendant sought the court's assistance in investigating these claims.

The record shows that as the court prepared to adjourn at the end of one day of trial, defendant sought to file this *pro se* motion. When the trial court made inquiry, defendant stated that he had initially presented the material to another judge during the pretrial portion of his case but had later withdrawn it. The court asked both of defendant's trial counsel if they cared to be heard as to the filing, but neither did. The court allowed the documents to be filed, then asked defendant if he had anything else to add. Defendant responded in the negative.

Defendant's motions came before the court again the next afternoon. After the jury was excused, defense counsel inquired of the court whether it had considered or ruled on defendant's motion. When invited to address the motion by the court, defense counsel responded that "the motions speak for themselves and would ask the Court to make the appropriate ruling." Following further consultation

with defense counsel, the court observed that the only prayer for relief in defendant's filing was a request that the court investigate his allegations and allow him to bring criminal charges against those named in his complaint. When defense counsel concurred in the court's understanding, the court ordered that a magistrate be made available to defendant so that he could seek a warrant. The court then recessed for the day.

Defendant's filing was discussed again the following day after the prosecutor concluded his closing argument in the guilt-innocence phase of the trial. Defendant advised the court that he had spoken with a magistrate, who had turned his complaints over to the district attorney. Because many of his complaints contained allegations against the prosecutors, defendant contended that the referral was futile. He again claimed that there was bias against him, that the prosecutors showed him disrespect, and that lies were being told about him. Defendant became increasingly disruptive during this colloquy, and the court warned defendant that he was at risk of being held in contempt. It does not appear that defendant's filing again came to the court's attention.

Defendant now contends that the trial court should have conducted a hearing on his allegations. However, our review of the record indicates that the court handled this matter properly. Many, even most, of the allegations in defendant's filing were mere conclusory claims that he was discriminated against because of his race, that witnesses lied, that the investigators paid witnesses to perjure themselves, and that he was innocent. Such claims are best addressed in the crucible of trial and cross-examination. Other issues raised by defendant, such as the admissibility of his statements to investigators, were handled in pretrial proceedings. Defendant was represented by two capable attorneys who, despite difficulties with their client obvious from a review of the transcript, took pains to preserve all his rights while mounting his defense. The record reveals that defendant's attorneys were understandably uncertain how best to handle this filing. Although they did not endorse it, they were careful to ensure that defendant's *pro se* claims were brought to the attention of the trial court. Defendant was sometimes obstreperous during the trial, to the point that he was shackled after threatening one of the prosecutors. Nevertheless, the judge presided over the proceedings with commendable restraint and forbearance. Although our review of the record reveals that defendant's filing was extraordinary and did not require any action by the court, the trial judge conscien-

STATE v. ROGERS

[355 N.C. 420 (2002)]

tiously allowed defendant to present his case before a neutral and detached magistrate. More than that he cannot ask. The court's handling of defendant's *pro se* filing was appropriate in all respects. This assignment of error is overruled.

**[10]** Defendant next argues that the prosecutor's closing arguments to the jury during the guilt-innocence phase of his trial were improper. Defendant focuses on three prosecutorial themes. First, defendant states that the prosecutor improperly commented on the exercise of his right not to testify or produce evidence. The prosecutor argued that "[o]nly the defendant" knew whether a knife admitted into evidence (apparently, a knife retrieved from defendant's storage bin) was from a set of knives found at defendant's home and that "[o]nly the defendant can tell you" his intent when he attacked the victim. The prosecutor also argued that not one person had come forward for defendant, and "[t]hat's [defendant's] choice." Because defendant did not object to this argument, we must consider whether the argument was so grossly improper that the trial court erred by failing to intervene *ex mero motu*. See *State v. Lloyd*, 354 N.C. 76, 116, 552 S.E.2d 596, 624 (2001).

Our review of the pertinent portions of the prosecutor's argument reveals that the prosecutor was addressing defendant's failure to refute the State's theory of the case while acknowledging that some questions remained unanswered. In addition to the comments quoted above, the prosecutor argued that "every witness that has come forward and testified before you under oath has pointed to this defendant's guilt. Every piece of evidence does the same thing. It's unrefuted. It's uncontradicted." Defendant contends that such arguments amount to a comment upon his failure to take the stand. However, we have found no error in an argument that the State's evidence was uncontradicted. *State v. Smith*, 290 N.C. 148, 168, 226 S.E.2d 10, 22, *cert. denied*, 429 U.S. 932, 50 L. Ed. 2d 301 (1976). A prosecutor's argument pointing out a defendant's failure to answer the State's evidence "is not a comment on the defendant's failure to testify." *State v. Barrett*, 343 N.C. 164, 179, 469 S.E.2d 888, 897, *cert. denied*, 519 U.S. 953, 136 L. Ed. 2d 259 (1996).

Defendant seeks to buttress his contention by pointing out that the jury became aware that he had taken a polygraph examination. Existence of this examination inadvertently came to light during cross-examination of a State's witness. The court denied the prosecutor's motion for a mistrial and, with the approval of defense counsel, gave the jurors a cautionary instruction to disregard all tes-

timony about a polygraph. Although defendant now argues that "[u]nanswered questions" about the polygraph undoubtedly fueled juror speculation as to why defendant had not testified, jurors are presumed to heed a trial judge's instructions. *State v. Nicholson*, 355 N.C. 1, 60, 558 S.E.2d 109, 148 (2002). Accordingly, we assume that the jurors followed the court's admonition to disregard any comments relating to a polygraph and that the stricken testimony played no part in the jurors' evaluation of the portions of the prosecutor's argument relating to defendant's failure to rebut the State's evidence.

[11] Second, defendant argues that the prosecutor improperly vouched for his own witnesses. The prosecutor argued that the State's witnesses had "no axe to grind whatsoever except to come in here and tell you the truth. That's it. There's nothing in it for them. Come in here and tell you the truth." Although defendant claims such an argument is improper, we have consistently held that counsel may give the jurors reasons why they should believe the State's evidence. *State v. Burrus*, 344 N.C. 79, 94, 472 S.E.2d 867, 877 (1996) (prosecutor's argument that if State's cooperating codefendant witnesses were lying, they would have told better lies and minimized their roles gave jury reason to believe those witnesses); *State v. Worthy*, 341 N.C. 707, 711-12, 462 S.E.2d 482, 484-85 (1995) (when the defendant attacked credibility of State's witness, prosecutor entitled to argue in response "that in deciding a witness' credibility, it is important to consider why a witness might be motivated to testify in a certain way"); *State v. Bunning*, 338 N.C. 483, 489, 450 S.E.2d 462, 464 (1994) (same where prosecutor argued that professional law enforcement officers would not make up testimony and risk reputation merely to convict the defendant). The prosecutor here did not personally vouch for the witnesses or place the State's imprimatur on their testimony; he argued only that logic compelled the conclusion that the witnesses were credible. There was no impropriety in this appeal to reason.

[12] Finally, defendant argues that the prosecutor improperly asked the jury to convict on the basis of community revulsion to the crime. The pertinent portion of the prosecutor's argument was as follows:

[A]s your District Attorney, ladies and gentlemen, I'm asking you on behalf of the State of North Carolina to return those guilty verdicts, not out of malice or ill will or hard feelings toward anybody, but because the facts and the law lead you there.

IN THE SUPREME COURT

STATE v. ROGERS

[355 N.C. 420 (2002)]

It would be improper, ladies and gentlemen, and I will not do it, to try to tell you what this community is sick and tired of. We're sick and tired of crime, sick and tired of this. And do you know why that's improper? Because you, you fourteen people, you fourteen people, citizens and residents of Halifax County, do you know that you are not the ear of Halifax County? You're not the ear of this county. You're not to sit here and listen what this county is sick and tired of. You are not to set the standards for this county by listening with your ears. You are, you are today, you are Halifax County. You are the conscience of Halifax County and you are the voice, you're the voice of Halifax County. So don't let anybody tell you what folks are sick and tired of. You tell us. You tell us through your verdicts, ladies and gentlemen, you tell us that we can have folks roaming our streets who cut and hack and slash and murder and abuse and sexually assault eighty-eight year old citizens of this county. If you feel that way turn him loose, find him not guilty and let's give him his T-shirt back and his row of knives back, and then we'll know where we stand in Halifax County.

So you tell us, ladies and gentlemen, you're the voice; you're the conscience. Just do what the very word ["]verdicts["] means. You know what the word verdict means. . . . It means to speak the truth.

The prosecutor did not argue that the jury should be swayed by local sentiment; instead, he pointed out that the jurors had the responsibility of deciding the case. We have upheld arguments characterizing the jury as the conscience of the community. *State v. Nicholson*, 355 N.C. at 43, 558 S.E.2d at 138. Moreover, in his argument, the prosecutor instructed the jurors not to be swayed by community sentiment. *See State v. Golphin*, 352 N.C. at 471, 533 S.E.2d at 237 ("[t]he State cannot encourage the jury to lend an ear to the community"). We discern no impropriety in this portion of the prosecutor's argument.

Our review of the prosecutor's closing argument satisfies us that the trial court did not err in failing to intervene *ex mero motu*. These assignments of error are overruled. Accordingly, we find no error in the guilt-innocence phase of defendant's first-degree murder trial or in his convictions of first-degree sexual offense and first-degree burglary.

CAPITAL SENTENCING PROCEEDING

**[13]** During the sentencing proceeding, defendant presented the testimony of Dr. Nathan Strahl, who, after being qualified, was tendered and accepted as an expert in psychiatry. During his direct examination, Dr. Strahl presented opinion testimony to support a number of mitigating circumstances, such as his opinion that defendant was under the influence of a mental or emotional disturbance at the time of the offense and that defendant did not have a meaningful relationship with his father. Dr. Strahl testified that in his opinion defendant suffered from a narcissistic personality disorder, demonstrated schizoid and antisocial traits, and also suffered from a general anxiety disorder with alcohol and marijuana dependence. In addition, Dr. Strahl was of the opinion that defendant's intelligence level fell in the dull-normal range, and he believed that defendant's personality, as diagnosed, resulted in part from defendant's genetic makeup and in part from his peer group and socialization. During this testimony, Dr. Strahl opined that defendant's condition was treatable and that he would benefit from prison's structured environment. At no point during his mitigation testimony did Dr. Strahl indicate that defendant was not guilty of or culpable for the offenses of conviction.

When the direct examination of Dr. Strahl was completed, he was cross-examined by the prosecutor. Much of the cross-examination consisted of the sparring between knowledgeable adversaries that makes this procedure "the 'greatest legal engine ever invented for the discovery of truth.'" *California v. Green*, 399 U.S. 149, 158, 26 L. Ed. 2d 489, 497 (1970) (quoting 5 John H. Wigmore, *Evidence* § 1367 (3d ed. 1940)). However, in a number of instances, the prosecutor's inquiries were, at best, problematic. The prosecutor's questions as to the amount of time Dr. Strahl spent working with criminal cases and the number of cases in which he had testified for the State and for a defendant were entirely appropriate. However, the prosecutor then asked how much Dr. Strahl was paid per hour and, upon receiving an answer, suggested that he was paid by defendant instead of the State:

Q. How long have you been employed by the defendant in this case?

A. Employed by the defendant? I think I'm employed by the State of North Carolina through the Office of Courts [sic] but I've been working on this case for over a year.

Despite Dr. Strahl's correction, the prosecutor's subsequent questions relating to the amount Dr. Strahl expected to be compensated for his work on the case continued to imply that he might be paid by defendant:

Q. Did you bill the defendant or the State of North Carolina for the first six months of your employment?

A. I've not billed anybody for anything at this point.

Q. Well, are you planning on doing it?

A. Yes, I am.

Q. For what?

A. I don't follow you, sir. For the same thing you're doing right here. You're working to do your job. I'm doing my job up here. I don't understand the difference.

Q. How long have you been notified, contacted, involved in this case?

A. Okay. I first saw [defendant] on June 14th of 1999 and I would estimate that I was contacted in May of 1999 to work on the case. I'm not sure there's anything else to state than that.

Q. So your billing started in May, you first saw [defendant] in June?

A. My billing will start for the contact time I spent on the case whether it's in a group of hours like it is today or it's nothing for two, three months. I'll only bill for the time that I spent on the case.

Q. And how many hours did you say so far?

A. Well, I think you remember. I said between twenty and thirty.

Q. Which is it?

A. I don't have the exact figure, sir. I don't tally that up. I'll tally it up when we're all done here. I'm estimating between twenty and thirty hours for this case. It's been one of the more rigorous cases to deal with and I've spent more time on it than most other cases I've had to deal with.

Q. So what you will bill somebody will be between $3000 and $4500 so far?

A. Somewhere in that range I would guess if that's how it works out mathematically. That's correct.

Q. For your work in this case?

A. That is correct.

Q. And do you understand, Dr. Strahl, that almost everybody in this room has spent more time with this defendant than you have?

A. I don't know that for a fact. If you say so. You're making something evil out of my charging for my expertise.

It is difficult to imagine that any prosecutor with even minimal experience would not know that experts testifying for indigent defendants are paid through the Administrative Office of the Courts. No apparent reason existed for the prosecutor to suggest otherwise except, perhaps, to confuse the jury.

When the prosecutor turned to Dr. Strahl's testimony that defendant had been affected by his chaotic early life and lack of contact with his natural father, the following exchange took place:

Q. . . . You were asked by [defense counsel] what affect this defendant's being born to an unwed mother had on him, isn't that correct?

A. That is correct.

Q. Did you grow up in a home with both your parents?

[DEFENSE COUNSEL]: Objection, Judge.

[THE COURT]: Overruled.

A. I did.

Q. So you're probably ill equipped in your personal life to testify as to how being born to an unwed mother might affect someone personally. Wouldn't you agree?

Dr. Strahl's childhood had little if anything to do with his professional ability to assess the impact on defendant of an absent parent. These questions were not a probe of Dr. Strahl's methodology; instead, they were an improper attempt to discredit or subvert his expert opinion by raising an irrelevant aspect of Dr. Strahl's personal life. Perhaps pertinently, the jury failed to find two submitted mitigating circumstances relating to defendant's relationships with his natural parents.

A similar attack occurred when the prosecutor questioned Dr. Strahl as to his opinion that defendant suffered from a narcissistic personality disorder.

Q. Now, Dr. Strahl, you have testified in giving your Curriculum Vitae that you are licensed to practice medicine in Virginia as well as North Carolina?

A. I have a license in Virginia as well. I would need to reactivate that because it's on kind of like a hold pattern since I don't work in Virginia directly and I don't have to pay certain fees but I can reactivate it any time. I'm in good standing with the State of Virginia.

Q. So you are not currently licensed to practice medicine in Virginia as you previously testified?

A. I think I am currently licensed to practice in the State of Virginia. I only need to send a letter indicating that I do want to do so. In my license I have a registration certificate from the State of Virginia that I receive every year or two that I pay for every year or two.

Q. Well, regardless of that, you're certainly familiar with the Violent Offender Profile that is prepared as offenders go into the Virginia Correction System, are you not?

A. I am not. I've never seen such a document before.

Q. How long have you been practicing medicine in Virginia?

A. I have never practiced medicine in Virginia. I think that's what I'm trying to tell you. I'm allowed to, I am able to, I'm registered to but I never have.

Q. What was the purpose of telling this jury then that you're licensed to practice in Virginia, if your license is not current and you've never done it?

A. Not doing it is different. My license is current. I pay a current fee and I have a number on my license that is active. I can practice anytime I want to practice in the State of Virginia. I do not choose to practice in the State of Virginia. I was asked where I am licensed and I'm licensed actively in two states, North Carolina and Virginia. Those remain true statements.

Q. You can practice anytime you want to in the State of Virginia?

A. That is correct.

Q. Would you define narcissistic for this jury one more time?

A. Narcissistic is a statement that results in an excessive level of entitlement over and above what is deserved.

The prosecutor returned to the unsavory implications of this line of questions in his closing argument, as discussed below. We also cannot fail to observe that, throughout this exchange, the prosecutor twisted Dr. Strahl's answers.

Finally, the prosecutor asked a question wholly irrelevant to Dr. Strahl's professional role in the case but designed to inflame the jury and diminish the impact of Dr. Strahl's testimony:

Q. Do you have any idea how many homes this defendant has invaded, how much space of other people, weak and defenseless people he's invaded. Do you have any idea?

A. Not exactly, sir. But you're asking me to condone his behavior and I'm not.

[DEFENSE COUNSEL]: Objection.

THE COURT: Please just answer the question, sir.

Before Dr. Strahl could respond to the court's instruction, the prosecutor asked an unrelated question. "The prosecutor's questions were not designed to elicit competent evidence. More in the nature of rhetorical assertions, their likely effect was unfairly to prejudice the jury against this witness." *State v. Sanderson*, 336 N.C. 1, 13, 442 S.E.2d 33, 40 (1994).

During his closing argument in the sentencing proceeding, the prosecutor returned to the themes addressed during his cross-examination of Dr. Strahl. In his preliminary comments to the jury, he distorted Dr. Strahl's testimony to suggest that Dr. Strahl countenanced defendant's conduct:

You're to bring [your recollections of the evidence] with you into this sentencing proceeding. You're to bring as well as your reason and common sense, you're to bring that experience into this proceeding with you. But in addition to that we're past [the] guilt[-innocence proceeding], well some of us are past it, there are two people who are not quite past it and that is the defendant and Nathan Strahl, they still haven't gotten it yet.

The prosecutor later reinforced his contention, unsupported by any evidence, that Dr. Strahl believed defendant was not guilty, then argued that the jury should find that Dr. Strahl padded his bill and lied in order to be paid:

To him [defendant] is still not guilty. He comes in here yesterday and said that he spent five hours with this defendant. Spent a half an hour yesterday morning as a courtesy call or something, I don't know what, of course, it'll cost the State of North Carolina seventy-five dollars for that half hour, but anyway, wouldn't it have been beneficial for him before he jumped up on the stand and took the oath to tell the truth, wouldn't it have been beneficial to go to this defendant when they had their little chat yesterday morning and say, [defendant], look, the jigs [sic] up son, the jigs [sic] up, this not guilty mess, we're past that, I'm gone [sic] look like a moron if I get up on that stand as an expert and talk about your innocence to the jury that convicted you. [Defendant] come clean with me son, let's talk about your emotional state. Let's talk about your mental disturbance when you went in there and sliced that lady up. And you're supposed to put stock, you're supposed to put credence, you're supposed to put credibility in that kind of expert?

Now, ladies and gentlemen, I don't mean to degrade, deride anybody personally or any profession, but dag-gone-it, when you come into this court and you put your hand on that Bible up there and you talk about your degrees and where you can practice medicine and where you can't practice medicine, you better not be trying to sell a bill of goods, you better not be looking to pick up your three thousand dollar check and stay on that defense witness testimony list and keep picking up that little ten percent. You need to come in here and get up and tell the truth cause that's what you deserve. That's what you deserve, ladies and gentlemen. *And it's a crying shame when education is corrupted for filthy lucre, it's a crying shame when people who've got the education abuse it.* It's up to you to determine whether that happened in this case or not. But it was a far cry on direct examination, everything was consistent, oh, yeah, answered yes to everything. As soon as he gets a little cross examination he wants to say somebody's evil for talking about what money he's making and he gets choked up and has to go to the water jug. *Well what's stuck in his throat? The truth?* It's been said, ladies and gentlemen, that it's a mighty small frog, it's a mighty small frog that can't get a croak

out of his own pond. And you may have heard it, I don't know, but you know what it means. You know what it means. You know that when all you can do in mitigation in a capital murder case is to put up a psychiatrist that has spent less time with this defendant than you have and know less about him, that's a mighty small croak in mitigation. *And saying it doesn't make it so cause you can pay somebody to say anything.*

(Emphases added.)

The prosecutor next belittled Dr. Strahl's profession:

When you get, you know, any discipline, psychiatry, psychology, whatever, plumbing, whatever, when you get to the point that you can make a call like that, you don't need to be running around testifying for any three thousand dollars. Play the lottery. Play the lottery if you're that good. Get on the Psychic Friends Network. Get to reading minds. And I don't say that again to deride the good doctor or to deride his profession, I say that because there's no evidence to back up what he spouts[.] . . .

. . . .

. . . Of course, Dr. Strahl was to work from various [tracts] and treatises because you remember he grew up in a two-parent home, didn't he? He grew up in a two-parent home. So when he wants to stand up or sit up and spout his expert opinion to you about this defendant's mitigation being from born to an unwed mother, he's not quite talking from experience, is he? He's talking about experience about like he is when he talks about this defendant's genetic makeup. Mumbo jumbo is basically what it is.

The prosecutor also used closing argument to misstate Dr. Strahl's testimony as to his Virginia license and to mischaracterize Dr. Strahl's diagnosis while suggesting that Dr. Strahl was himself mentally afflicted:

[C]onsider whether the defendant has been diagnosed as having a Narcissistic Personality Disorder.

Well, the good doctor defined that for us as being having an excessive level of entitlement. And then when I asked if he's licensed to practice in Virginia he said I can treat any patient I want to over there. Of course, he owes them some money, he's not currently licensed, but that's why, you remember he was

asked, well, define narcissistic for us one more time, Dr. Strahl. Define that for us one more time. Excessive level of entitlement. Everybody has—everybody who thinks something of himself is narcissistic I guess, it's called self-esteem. But thank you Dr. Strahl for making it a personality disorder, thank you for driving that square peg into a round hole and taking self-esteem and making something, as he would call it, making something evil out of it.

Although defendant unsuccessfully objected to some of the prosecutor's cross-examination questions, he did not object to the prosecutor's closing argument.

It is well settled in North Carolina that counsel is allowed wide latitude in the argument to the jury. Even so, counsel may not place before the jury incompetent and prejudicial matters by injecting his own knowledge, beliefs and personal opinions not supported by the evidence. The control of the arguments of counsel must be left largely to the discretion of the trial judge, and the appellate courts ordinarily will not review the exercise of the trial judge's discretion in this regard unless the impropriety of counsel's remarks is extreme and is clearly calculated to prejudice the jury in its deliberations. In capital cases, however, an appellate court may review the prosecution's argument, even though defendant raised no objection at trial, but the impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.

*State v. Johnson*, 298 N.C. 355, 368-69, 259 S.E.2d 752, 761 (1979) (citations omitted).

A number of our cases have considered arguments where an attorney has directly or indirectly challenged the veracity of a party or witness. Although we have found grossly improper the practice of flatly calling a witness or opposing counsel a liar when there has been no evidence to support the allegation, *Couch v. Private Diagnostic Clinic*, 133 N.C. App. 93, 100, 515 S.E.2d 30, 36, *aff'd per curiam*, 351 N.C. 92, 520 S.E.2d 785 (1999); *see also State v. Locklear*, 294 N.C. 210, 217-18, 241 S.E.2d 65, 70 (1978), we have also held that it is proper for a party to point out potential bias resulting from payment that a witness received or would receive for his or her services, *State*

*v. Lawrence*, 352 N.C. 1, 22, 530 S.E.2d 807, 820 (2000), *cert. denied*, 531 U.S. 1083, 148 L. Ed. 2d 684 (2001). However, where an advocate has gone beyond merely pointing out that the witness' compensation may be a source of bias to insinuate that the witness would perjure himself or herself for pay, we have expressed our unease while showing deference to the trial court. For instance, we held that an argument made during the guilt-innocence phase of a capital case where the prosecutor stated in reference to the defendant's expert witness, " 'It is a sad state of our legal system[] that when you need someone to say something, you can find them. You can pay them enough and they'll say it,' " *State v. Murillo*, 349 N.C. 573, 604, 509 S.E.2d 752, 770 (1998), *cert. denied*, 528 U.S. 838, 145 L. Ed. 2d 87 (1999), was not so grossly improper as to require the trial court to intervene *ex mero motu, id.* at 606, 509 S.E.2d at 771. Similarly, where a prosecutor argued during a capital sentencing proceeding that the defendant's psychiatric expert was " '[a] guy who's making fifteen hundred dollars a day is absolutely going to tell you every time you show him a crime like this that it's the result of mental illness. His way of life depends on that. . . . Nobody's paying someone fifteen hundred dollars a day to [say defendant is sane],' " *State v. May*, 354 N.C. 172, 180, 552 S.E.2d 151, 156 (2001), we again held that the trial court did not err in failing to intervene *ex mero motu, id.* at 181, 552 S.E.2d at 157.

Despite this deference, we have advised counsel that such arguments, imputing perjury to a witness on the basis of evidence no more substantial than the mere fact the witness was compensated, are improper. Where the prosecutor argued of the defendant's expert that " 'I submit to you, ladies and gentlemen, she's getting paid three thousand dollars to work on this case, she'll say anything he wants her to say,' " *State v. Spruill*, 338 N.C. 612, 651, 452 S.E.2d 279, 300 (1994), *cert. denied*, 516 U.S. 834, 133 L. Ed. 2d 63 (1995), we assumed *arguendo* that the statement was improper, *id.* at 652, 452 S.E.2d at 300. More recently, where a prosecutor argued that the defendant's mitigating circumstances " 'were developed skillfully by the defense experts who go around this State testifying for defendants in capital cases, selling their services and opinions at rates from $75 to $125 an hour,' " *State v. Hill*, 347 N.C. 275, 299, 493 S.E.2d 264, 278 (1997), *cert. denied*, 523 U.S. 1142, 140 L. Ed. 2d 1099 (1998), we again assumed the argument was improper but not so grossly improper as to entitle the defendant to a new sentencing hearing, *id.* at 300, 493 S.E.2d at 278. We went on to disapprove of "one of the statements

made by the prosecutor," presumably the one quoted above.[2] *Id.* Although it might be possible to differentiate the particular words in the instant argument from those used in the cases cited above, we would have to slice the salami pretty thin. Accordingly, consistent with our holdings in *Murillo* and *May*, we conclude that while the prosecutor's argument that the expert should not be believed because he would give untruthful or inaccurate testimony in exchange for pay was improper, it was not so grossly improper as to require the trial court to intervene *ex mero motu.*

Nevertheless, we are disturbed that some counsel have failed to heed our repeated warnings that such arguments are improper, even if not always grossly so. *State v. Smith*, 351 N.C. 251, 270, 524 S.E.2d 28, 42, *cert. denied*, 531 U.S. 862, 148 L. Ed. 2d 100 (2000). One measure of the professionalism that we expect from litigants in North Carolina courts is the avoidance of all known improprieties. *State v. Jones*, 355 N.C. 117, 127-28, 558 S.E.2d 97, 104 (2002). Our prior holdings, where the conviction was not reversed on the basis of a prosecutor's improper argument only because of the demanding standard of review, should not be construed as an invitation to trial counsel to try the same thing again. We admonish counsel to refrain from arguing that a witness is lying solely on the basis that the witness has been or will be compensated for his or her services. We also instruct trial judges to be prepared to intervene *ex mero motu* if such arguments continue to be made. *Id.* at 128, 558 S.E.2d at 104.

[14] Our inquiry does not end here, however. In the case at bar, the prosecutor went beyond ascribing the basest of motives to defendant's expert. As detailed above, he also indulged in *ad hominem* attacks, disparaged the witness' area of expertise, and distorted the expert's testimony. We have observed that "maligning the expert's profession rather than arguing the law, the evidence, and its inferences is not the proper function of closing argument." *State v. Smith*, 352 N.C. at 561, 532 S.E.2d at 792. "When vigor in unearthing bias becomes personal insult, all bounds of civility, if not of propriety, have been exceeded." *Id.* Particularly in capital cases, we believe it appropriate to require that practitioners conduct themselves with a probity and dignity consistent with the gravity of the proceedings.

That a prosecutor refrain from improper conduct is especially important in the context of a capital sentencing hearing,

---

2. We make this assumption because the comment is the only one quoted in that portion of our opinion in *Hill*.

where the issue before the jury is whether a human being should live or die and where this decision involves the exercise of the jury's judgment as to how certain aggravating and mitigating circumstances should be weighed against each other.

*State v. Sanderson*, 336 N.C. at 8, 442 S.E.2d at 38. In light of the cumulative effect of the improprieties in the prosecutor's cross-examination of defendant's expert and the prosecutor's closing argument, we are unable to conclude that defendant was not unfairly prejudiced. *Id.* at 15, 442 S.E.2d at 40.

Accordingly, we hold that defendant is entitled to a new capital sentencing proceeding. Because we reach this result, we need not address other issues raised by defendant relating to his sentencing proceeding that are unlikely to recur.

NO. 97CRS6891, FIRST-DEGREE MURDER: NO ERROR IN THE TRIAL; DEATH SENTENCE VACATED AND CASE REMANDED FOR NEW CAPITAL SENTENCING PROCEEDING.

NO. 97CRS6892, FIRST-DEGREE BURGLARY: NO ERROR.

NO. 97CRS6893, FIRST-DEGREE SEXUAL OFFENSE: NO ERROR.